**UNITED STATES DISTRICT COURT**
DISTRICT OF MINNESOTA

| | |
|---|---|
| Peerless Indemnity Insurance Company, | Civil No. 15-04112 (ADM-LIB) |
| | Judge Ann D. Montgomery |
| Plaintiff, | Magistrate Judge Leo I. Brisbois |
| v. | |
| Sushi Avenue, Incorporated, | **DEFENDANT'S MEMORÁNDUM** |
| | **OF LAW IN SUPPORT OF ITS** |
| | **MOTION TO COMPEL AND** |
| Defendant. | **MOTION TO REDESIGNATE** |

## INTRODUCTION

This case arises out of Defendant Sushi Avenue, Incorporated's ("Sushi Avenue" or "Defendant") procurement of worker's compensation polices from Plaintiff Peerless Indemnity Insurance Company ("Plaintiff" or "Peerless") and Plaintiff's audit of the same. In particular, Plaintiff seeks over $730,000 in additional premiums as a result of the Plaintiff's self-imposed inclusion of independent contractor labor in an audit of Defendant's workers' compensation policies in 2013-14 and 2014-15.[1]

Plaintiff's claims are based primarily on its interpretation of the appropriate classification of Sushi Avenue's kiosk operators in an audit conducted in 2014. Plaintiff has asserted that this interpretation was based on a conclusion made by Plaintiff's legal

---

[1] Under the policies in effect, Plaintiff had the contractual right to conduct an audit - and routinely did – to verify that the correct premium was charged. Any adjustment of the premiums, which is referred to as an audit premium – would be assessed after evaluating the payroll of the insured, comparing that with what was provided at the outset of the policy and including any other individuals that were lawfully covered by the policy issued (e.g. – new hires during the policy period). The increase by Peerless following the 2014 audit was over nine times the initial estimated amount.

department starting in May of 2014.

Defendant has not had access to the documents regarding this analysis and dispute because Plaintiff has withheld them on the basis of attorney-client privilege and/or the work product doctrine. Accordingly, Defendant seeks the production of all of Plaintiff's communications concerning the classification of the independent contractors from the first contact in 2014 with Plaintiff's legal department through June 30, 2015. Defendant is entitled to these communications because Plaintiff has, among other things, placed the advice of its counsel in issue, waiving any attorney-client privilege. Additionally, the communications were made prior to the anticipation of litigation and are therefore also outside the scope of the work product doctrine. Defendant also seeks to designate the September 2, 2014, email as not being privileged.

## **BACKGROUND**

### I.    **Sushi Avenue's Business Model**.

Sushi Avenue is in the business of, among other things, operating sushi kiosks in various grocery stores and supermarkets across the nation, including Minnesota. In doing so, Sushi Avenue enters into agreements (or master agreements) with the owners of those supermarkets, grocers or other entities that desire to have a sushi kiosk located within a store. Sushi Avenue then, for most but not all of the kiosks, contracts with independent

contractors to operate the sushi kiosks located within the supermarkets.  Each independent contractor agreement is specific to each store and the sushi bar located therein, with each operator being obligated to follow rules/regulations of those stores, in general, and the applicable local health code, in specific. There are over 200 independent kiosks that are currently operated in over 20 states.

Sushi Avenue in turn employs regional managers, as employees, to work with those independent contractors within the individual supermarkets.  Thus, it uses a mixture of independent contractors and employees for this part of its business operations.

II.     **Plaintiff's Audit of Defendant's Worker's Compensation Policies**.

Plaintiff provided Defendant with worker's compensation insurance coverage for Defendant's employees under policy number WC 8948248, which was in effect from March 19, 2013 through March 19, 2014 (the "first policy period"), and March 19, 2014 through February 15, 2015 (the "second policy period"). *See Affidavit of Blair A. Harrington* (hereinafter referred to as "Harrington Aff.") *¶ 3*. To assist in establishing premiums, Defendant provided Plaintiff with payroll to calculate an estimated premium of $46,864 for the first policy period.  At the conclusion of the first policy period, Defendant renewed its coverage and was provided with an estimated premium of $39,630 for the second policy period. *Id. at ¶ 4.*

On April 2, 2014, Plaintiff conducted a routine physical audit of the first policy period.  Plaintiff sent Dawn Mathison ("Ms. Mathison"), a Senior Premium Auditor, out to Defendant's offices located at 895 Blue Gentian Road, # 6, Eagan, Minnesota to conduct the audit. *Harrington Aff., ¶ 16, Ex. 4.*

3

As part of the audit, Ms. Mathison reviewed Defendant's actual (and not estimated) payroll, 1099s and 941s for the first policy period. *Id.*  Ms. Mathison also received and reviewed a copy of Defendant's Contract with Independent Contractor (the "Contract") that Defendant enters into with its sushi kiosk operators.  Based on her analysis of the Contract and other anecdotal evidence she gathered from talking to others (but not Plaintiff's legal department)[2] about the Contract, Ms. Mathison determined that there was an employer/employee relationship between the Defendant and its sushi kiosk operators. *Harrington Aff., ¶ 16, Ex. 5.*  On April 4, 2014, Ms. Mathison emailed a copy of the Contract to Catie Sebolt ("Ms. Sebolt"), a former underwriter, outlining the same.  *Id.*  On April 8, 2014 Ms. Sebolt replied stating, "I can see where there is concern for this account and would appreciate if you would hold off on processing the audit at this time. *I believe we need to consult our legal department on some of the items in the contract you sent me a copy of.*" (emphasis added). *Id.*

On April 28, 2014, Ms. Mathison emailed Ms. Sebolt and copied Nicole Roy ("Ms. Roy"), another former underwriter, on the correspondence asking if they were still waiting to hear back from Plaintiff's legal department.  Ms. Roy replied on May 8, 2014: "I did receive info back from legal. Will take me a couple days to run through and be back with you." *Harrington Aff., ¶ 16, Ex. 6.*  Plaintiff's Amended Redaction Log indicates that Ms. Roy was the party who initially contacted Peerless' legal department on May 2, 2014 (*see*

---

[2] Ms. Mathison is neither an attorney nor part of Peerless' legal department. In fact, despite her leading the audit (and coming to her own conclusions), she did not at any time directly communicate with Plaintiff's legal department. All communications from Peerless' legal department passed through other individuals at Peerless to Ms. Mathison.

*Harrington Aff., ¶ 14, Ex. 2 at Doc. Nos. 100-102*) and was the party to whom a response was provided.

On August 4, 2014, Ms. Mathison emailed James Slaski ("Mr. Slaski"), her field audit manager, indicating she had "finally" finished the audit. *Harrington Aff., ¶ 16, Ex. 7.* Ms. Mathison stated the delay in the audit report was in part due to the "wait for Legal to review. (sic)" *Id.* The audit report Ms. Mathison issued is dated August 7, 2014. *Harrington Aff., ¶ 16, Ex. 4.* Notably, the first three lines of the audit recommendation, at the conclusion of the report, are redacted as "confidential communications with attorney reflecting legal thoughts, mental impressions, and legal opinion." *Harrington Aff., ¶ 14, Ex. 2 at Doc. Nos. 1; 4; 107; 194; and 231.* Plaintiff claims attorney-client and work product protection for these three lines despite the fact that Ms. Mathison authored the audit report, no other party is identified as a recipient and Ms. Mathison did not herself speak with Plaintiff's legal department. *Harrington Aff, ¶ 16, Ex. 4 at P-SA000290.*

In the audit, Ms. Mathison included Defendant's independent contractors under the category of "employees," charging $12 million in 1099 labor (or 90% of the total 1099). *Id.* Critically, in calculating the adjusted premium, it appears that Ms. Mathison did not follow Plaintiff's own internal procedures and used 90% of the total amount listed in each independent contractor's 1099 instead of the 50% called for in Plaintiff's manual. *Harrington Aff., ¶ 16, Ex. 8.*[3] The audit resulted in an additional charged premium of

---

[3] Specifically, Plaintiff knew that the 1099 was a mixture of labor and materials, therefore the 90% percentage base was unwarranted. All efforts to explain the labor/materials split to Ms. Mathison were simply rebuffed. Ironically, a discussion on the appropriate rate is also claimed as being privileged.

$389,354, almost nine times the amount initially estimated. *Harrington Aff., ¶ 5.*



On August 26, 2014, Ms. Roy, expressing her dismay at the audit results, sent Ms. Mathison email correspondence asking her to "validate these figures are accurate" and stating, "I had no idea we would be charging $400k ap. We won't be able to collect for sure. Is this all correct?" *Harrington Aff., ¶ 16, Ex. 9.* Ms. Mathison replied stating that the figures looked correct based on the $12 million in labor. *Id.*

Regardless, Ms. Roy continued to question the results of the audit. On September 2, 2014, she sent another email to Ms. Mathison stating that the independent contractors "frankly…are all sole proprietors and not required to carry insurance coverage." *Id.*

Following Ms. Roy's September 3, 2014 email, Ms. Mathison decided to conduct her own legal research.  On September 5, 2014, Ms. Mathison sent an email to Defendant's insurance agent, Melissa Marroquin ("Ms. Marroquin") of Hornig Insurance Agency stating, "*I did a great deal of research today as to what is needed in NY, IL and MN to relieve Sushi Avenue of the Employee/Employer status for their Independent Contractors. I've attached supporting documents for each.*" *Harrington Aff., ¶ 16, Ex. 10* (emphasis

added). Ms. Mathison then proceeded to outline her research to Ms. Marroquin, drawing her own legal conclusions with respect to the worker's compensation laws in each of these states. *Id*.

Despite numerous efforts, Defendant was not able to reach a resolution with Plaintiff regarding the additional audit premium for the first policy period.  As a result, Plaintiff cancelled Defendant's worker's compensation coverage under the second policy period effective March 18, 2015. *Harrington Aff., ¶ 5*.  Ms. Mathison began conducting a cancellation audit for the second policy period in April of 2015. *Harrington Aff., ¶ 16, Ex. 11*. Ms. Mathison prorated the cancellation audit according to the figures obtained in the audit of the first policy period, resulting in an additional premium of $357,640.  *Id. at ¶ 5; 16, Ex. 11*.

After no payment was received for either premium audit (except for the required payment for the estimated premium) Plaintiff assigned Defendant's account to Curlette Alexander ("Ms. Alexander"), a senior receivables analyst, on May 14, 2015. *Harrington Aff. at ¶ 16, Ex. 12*.

Defendant continued to dispute the inclusion of independent contractor labor in the audits.  On May 19, 2015, Defendant, through its insurance agent, provided Plaintiff with documentation from an audit conducted by the Minnesota Department of Revenue as evidence of Plaintiff's improper inclusion of Defendant's independent contractors in the

audits. *Harrington Aff., ¶ 16, Ex. 13*.   Specifically, the documents provided relating to the Minnesota Department of Revenue audit discussed and analyzed, in detail, how the independent contractors were properly classified – and were not employees. The Minnesota Department of Revenue audit and its conclusions were less than two (2) years old.

This Minnesota Department of Revenue audit information was forwarded to Plaintiff's legal department for review on May 22, 2015. *Id. at ¶ 16, Ex. 14*.  Plaintiff's redaction logs indicate that discussions on the Minnesota Department of Revenue information (and that audit's determination of proper classification of independent contractors) continued throughout the month.  Finally, on June 22, 2015, Timothy Zepnick ("Mr. Zepnick"), the regional Vice President, laid out Plaintiff's position to Defendant regarding the Minnesota Department of Revenue audit in an email. *Harrington Aff., ¶ 16, Ex. 15*.  Plaintiff stated its position had not changed and it did not feel the Minnesota Department of Revenue audit applied. *Id.*

On June 30, 2015, Plaintiff was advised that Defendant continued to dispute the audit and would be proceeding legally.  Ms. Alexander sent an email to Mr. Zepnick on June 30, 2015 stating, "I spoke with Melissa the agent this morning who stated she discussed your email below with the insured on or about 6/23/15 and his response is that he intends to proceed legally.  Based on this response I've asked my manager to assign this account to one of our collection attorneys unless you object or have any additional concerns." *Harrington Aff., ¶ 16, Ex. 16*.  Shortly thereafter, this lawsuit commenced.

**III.**   **Plaintiff's Deficient Document Production and Invalid Claims of Privilege**.

On April 22, 2016, Defendant served Plaintiff with its First Set of Interrogatories and Requests for Production. *Harrington Aff., ¶ 6.* Plaintiff served responses to Defendant on May 23, 2016. In combination with Plaintiff's initial disclosures, Plaintiff produced a total of 1,015 documents to Defendant by June 7, 2016. *Id., ¶ 7-8.* Plaintiff also provided Defendant with a Redaction Log dated June 7, 2016, which identified 37 documents redacted on the basis of attorney-client privilege and/or the work product doctrine. *Id. at ¶ 8, Ex. 1.*

In reviewing the Redaction Log, Defendant noticed documents for which attorney-client and/or work product privileges were claimed yet no attorney was identified as an author, recipient, or even a party to the communication. *Harrington Aff., ¶ 8, Ex. 1 at Doc. Nos. 1-5; 33; 36.* Defendant also noticed a majority of these communications were made with legal prior to June 30, 2015, following Plaintiff's review of the Minnesota Department of Revenue audit information and its decision not to follow the same.

On September 8, 2016, Defendant sent correspondence to Plaintiff outlining these improper claims of attorney-client and work product privilege and demanding they be reproduced unredacted. On September 13, 2016, Plaintiff refused to produce unredacted versions of the documents. *Meet and Confer, ¶ 2.* Instead, Plaintiff offered to provide an

9

amended privilege log to better articulate its assertions of privilege. *Id.*

Additionally, on September 8, 2016, Defendant received documents produced in response to Plaintiff's subpoena duces tecum of Hornig Insurance Agency (Defendant's insurance brokers for Peerless policies). *Harrington Aff., ¶ 9.* These documents included a number of emails that originated from Ms. Roy but were not produced by Plaintiff. On September 13, 2016, Defendant requested the missing correspondence and again questioned Plaintiff's continued assertions of privilege. *Meet and Confer, ¶ 3.*

Defendant proceeded with depositions on September 14 and 15, 2016. Throughout the course of these depositions, Defendant learned, for the first time, of additional written communications responsive to Defendant's document requests that were not produced by Plaintiff. *Harrington Aff., ¶ 11.* Plaintiff's counsel also acknowledged that it was unaware of many of the communications disclosed by the witnesses during the depositions and agreed to investigate the same. *Id.* On September 16, 2016, Defendant's wrote another deficiency letter.

In response to Defendant's September 16, 2016, deficiency letter, Plaintiff produced 4,936 pages of responsive documents. *Harrington Aff., ¶ 12.* Plaintiff represented that its supplemental production was continuing and that it would provide Defendant with an updated redaction log to further clarify its asserted privileges. *Id.* Plaintiff produced an additional 267 documents on October 3, 2016 and 336 documents on October 7, 2016. *Id., ¶ 13.*

Plaintiff's supplemental production included the previously missing correspondence with Plaintiff's legal department in 2014 with Ms. Roy and revealed a

clearer timeline of Plaintiff's communications ███████████████████████

█████████████████████████████████████ Plaintiff's supplemental

production also included Ms. Mathison's file, and the rules and regulations she relied on

in conducting and then supporting her audit results.  Defendant also observed an even

higher level of redaction in Plaintiff's supplemental production, including several series of

documents where entire pages were blacked out.

On October 18, 2016, Plaintiff produced an Amended Redaction Log. *Harrington*

*Aff., ¶ 14, Ex. 2.* The Amended Redaction Log identified 295 redacted documents (258 new

documents) but did not provide any further clarification with respect to Plaintiff's claims

of attorney-client and work product privilege. *Id.* On October 24, 2016, Defendant sent yet

another deficiency letter detailing the continuing deficiencies in Plaintiff's Amended

Redaction Log and demanded that Plaintiff produce unredacted communications made

through June 30, 2015. *Meet and Confer, ¶ 6.*

Plaintiff, by letter dated October 26, 2016, refused. *Id. at ¶ 7.* Plaintiff maintained

that the communications regarding the audit and classification of the independent

contractors, regardless of their author, recipient(s), or included parties ████████████

█████████████████████████ and included 81 communications between May

2015 and June 30, 2015, regarding the Minnesota Department of Revenue audit

information) were properly withheld on the basis of attorney-client privilege.  Plaintiff also

continued to assert attorney-client privilege for the lines redacted in Ms. Mathison's audit

report.

████████████████████████████████████████████████████

**IV.**   **The Current Motion**.

As argued in more detail below, Defendant seeks production of some (but not all) of the claimed privileged documents. Hiding behind the results of its audit, Plaintiff attempted to use the privilege as both a sword and a shield: a sword because the audit, according to Peerless, properly concluded and categorized Defendant's independent contractors as employees thus supporting the increased or audit premium; as a shield to prohibit any scrutiny of that conclusion – This raises the question, then, of whether the audit and its results are properly supported.

The documents Plaintiff asserts are protected by the attorney-client categories: (1) communications from the first contact with Plaintiff's legal department in 2014 through May 19, 2015, concerning the audit; (2) communications from May 19, 2015 through June 30, 2015, concerning the Minnesota Department of Revenue audit; and (3) all communications after June 30, 2015.  Defendant is seeking to compel production for the first two (2) time periods: May 2014 to May 19, 2015; and May 19, 2015 to June 30, 2015.

This encompasses 123 documents on Plaintiff's Amended Redaction Log.[4]  This includes production of any documents where no attorney is identified as a party to the communication, regardless of when the communication occurred.[5]  Defendant is not seeking to compel any communications after June 30, 2015 (the third time period).

Alternatively, Defendant requests these documents be submitted to the Court for an *in camera* determination of whether they are protected by the attorney-client privilege and/or the work product doctrine.  Defendant also moves the Court for a determination that Ms. Roy's September 3, 2014, email is not protected by the attorney-client privilege and/or work product doctrine or, in the alternative, that any such privilege has been waived by Plaintiff.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide for a broad scope regarding discovery and the production of documents. To that end, parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1).  When a party withholds information that is otherwise discoverable on the basis of privilege, the burden is on the party asserting the privilege to expressly make and support the claim and describe the nature of the documents withheld.  Fed. R. Civ. P. 26(b)(5). When making a privilege determination, a court uses federal common law unless a relevant federal rule, statute, or constitutional provision applies. Fed. R. Evid. 501.  In diversity

---

[4] *See Harrington Aff., ¶ 14, Ex. 2, Doc. Nos. 1; 4; 8-9; 12; 16-17; 19-23; 27-28; 31-47; 94-128; 130-135; 194-195; 209-223; 232-236; 249-260; 275-291.*
[5] *See Id., Doc Nos. 1; 4; 5; 33; 36; 107; 194; 198; 231; and 237.*

cases, the court must apply federal law to resolve work product claims and state law to resolve attorney-client privilege claims. *Bituminous Cas. Corp. v. Tonka Corp.*, 140 F.R.D. 381, 386 (D. Minn. 1992).

## I.    <u>Attorney-Client Privilege</u>.

Because subject matter jurisdiction in this case rests on diversity, the attorney-client privilege is governed by Minnesota law. *Id.*   Minnesota follows Professor Wigmore's classic description of the attorney-client privilege, which requires a confidential communication *between an attorney and client* for the purpose of securing legal advice. *Brown v. St. Paul City Ry.,* 62 N.W.2d 688, 700 (Minn. 1954) (emphasis added). The attorney-client privilege has been described succinctly as follows:

> 1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Kobluk v. Univ. of Minnesota*, 574 N.W.2d 436, 440 (Minn. 1998) (citing 8 John Henry Wigmore, *Evidence* § 2292, at 554 (McNaughton rev.1961)); *see also* Minn. Stat. § 595.02, subd. 1(b).

"[T]he attorney-client privilege is a barrier to disclosure and tends to suppress relevant facts and, as such, must be strictly construed." *Leer v. Chicago, M., St. P. & P. Ry. Co.*, 308 N.W.2d 305, 309 (Minn. 1981).   The party invoking the protection of the attorney-client privilege bears the burden of establishing the existence and application of the privilege. *Kobluk*, 574 N.W.2d at 440.

However, the attorney-client privilege is not without its limits. "[I]f an unprivileged

document exists before there exists an attorney-client relationship the mere delivery of the document to an attorney does not create a privilege." *Brown v. Saint Paul City Ry. Co.*, 62 N.W.2d 688, 700 (Minn. 1954); *see also Kobluk*, 574 N.W.2d at 441 (stating that a distinction must be drawn between documents that exist independently of the attorney-client relationship and those that come into existence as a communication between the attorney and the client). The test is whether the document first came into existence as part of a communication to the attorney. *Kobluk*, 574 N.W.2d at 441. "Where the document already had an independent existence and the communication consists in bringing its contents to *the attorney's knowledge,* that *knowledge* is not to be disclosed by his [or her] testimony * * *. But the physical possession of the document is distinct from that knowledge, and to compel production of the document is not to compel the disclosure of the communication." *Id.*

A corporate client may assert the attorney-client privilege, but not all communications to corporate counsel are privileged. *Leer*, 308 N.W.2d 305; *Kahl v. Minnesota Wood Specialty*, *Inc.*, 277 N.W.2d 395 (Minn. 1979). Although Minnesota has not established a separate test for corporate communications with counsel, the Eighth Circuit has held that the attorney-client privilege should be available to a corporation if:

> (1) (T)he communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir. 1978) (en banc); *see also*

*Leer*, 308 N.W.2d at 307–09 (considering, but not adopting, three alternative tests describing the attorney-client privilege, including the test announced in *Upjohn Co. v. United States,* 449 U.S. 383 (1981)).  It is the corporation's burden to show that these requirements apply to the communication. *Diversified*, 572 F.2d at 609.

The scope of the attorney-client privilege may further be limited as a result of the attorney's role in the same. "It is clear that the attorney must be acting in the role of legal counsel with respect to the information in issue before the privilege may attach. If the attorney is acting in some other role, as an ordinary businessman for example, the privilege may not be properly claimed." *Mission Nat. Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986).  The attorney-client privilege does not protect against communications that relate only to business or technical data.  *Simon*, 816 F.2d at 403.  Thus, the mere inclusion of an attorney on communications does not cloak that communication with a privilege. There has to be more to it: namely, the dissemination of legal advice – not a discussion on the business of the corporation.

## II.    **Work Product Doctrine**.

Under federal law, the work product doctrine protects from disclosure of materials prepared by an attorney in anticipation of litigation. *Hickman v. Taylor*, 329 U.S. 495, 511 (1947). However, the work product doctrine, like the attorney-client privilege, is not without its limits. "The inchoate possibility, or even the likely chance of litigation, does not give rise to the privilege." *Mission*, 112 F.R.D. at 163.  There are two kinds of work product: ordinary work product and opinion work product. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir. 2000).  In contrast to the attorney-client privilege, items

considered ordinary work product may be discoverable upon a showing that the requesting party has a substantial need and cannot, without undue hardship, obtain their substantial equivalent by other means. Fed. R. Civ. P. 26(b)(3)(A). However, opinion work product, consisting of "mental impressions, conclusions, opinions, or legal theories of a party's attorney" must be protected against disclosure. Fed. R. Civ. P. 26(b)(3)(B).

The work product doctrine does not protect from the disclosure of materials prepared in the ordinary course of business. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir.1987). An investigative report developed during a "routine investigation of a possibly resistible claim" is not sufficient to warrant work product protection. *Mission*, 112 F.R.D. at 163. The party asserting the work product privilege bears the burden of establishing the applicability of the privilege. *Progressive Cas. Ins. Co. v. F.D.I.C.*, 302 F.R.D. 497, 501 (N.D. Iowa)*, aff'd*, 49 F. Supp. 3d 545 (N.D. Iowa 2014). If the asserting party meets its burden, the burden shifts to the opposing party to prove substantial need and undue hardship. *Id.*; *see also* Fed. R. Civ. P. 26(b)(3).

## III.   <u>Waiver</u>.

### a.   <u>At-Issue Waiver/Advice-of-Counsel Defense</u>.

Privilege is waived when the communication is voluntarily disclosed to a third party. *United States v. Hyles*, 479 F.3d 958, 971 (8th Cir. 2007) (citation omitted); *Kobluk*, 574 N.W.3d at 443. Waiver is governed by the Federal Rules of Evidence and may be made intentionally, inadvertently or by implication. Fed. R. Evid. 502; *see also Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *7 (D. Minn. Apr. 1, 2014).

There is no settled rule governing waiver by implication, but common factors to finding an implied waiver include: "(1) assertion of the privilege is a result of an affirmative act; (2) through the affirmative act, the asserting party has placed the protected information at issue by making it relevant; and (3) application of privilege would deny the opposing party access to information vital to its defense*." Medtronic, Inc. v. Intermedics, Inc.*, 162 F.R.D. 133, 134–35 (D. Minn. 1995); *see also Shukh v. Seagate Tech., LLC*, 872 F. Supp. 2d 851, 857 (D. Minn. 2012). A court may find an implied waiver of privilege after examining two elements: (1) implied intention, and (2) fairness and consistency. *Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201 (8th Cir.1982), *cert. denied,* 459 U.S. 1017 (1982).

"A waiver of the attorney-client privilege may be found where the client places the subject matter of the privileged communication at issue." *Baker*, 209 F.3d at 1055. At-issue waiver is commonly implicated when a client relies on legal advice as a claim or defense. *Id*. When at-issue waiver is invoked, "the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because the issue cannot be determined without an examination of that advice." *PETCO Animal Supplies Stores, Inc. v. Ins. Co. of N. Am.*, No. CIV. 10-682 SRN/JSM, 2011 WL 2490298, at *22 (D. Minn. June 10, 2011).

"[P]arties asserting the advice-of-counsel defense 'may not selectively disclose privileged communications that it considers helpful while claiming privilege on damaging communications relating to the same subject.'" *See Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.*, 210 F.R.D. 673, 675 (D. Minn. 2002) (quoting *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 926, 929 (N.D. Cal. 1976)). An

inquiry into the scope of an attorney-client privilege waiver, arising from the assertion of the at-issue or advice of counsel defense, should be guided by concerns of fairness. *Minnesota Wild*, 210 F.R.D. at 675.

"The assertion of an advice-of-counsel defense, can also serve as a waiver of attorney work product immunity." *Minnesota Wild*, 210 F.R.D. at 675. Waiver of work product protection may be more limited in scope, but involves the same fairness inquiry, requiring a "balance of the need for discovery with the right of an attorney to retain the benefits of his own research." *Id*. at 676 (quoting *Handards*, 413 F.Supp. at 929).

### b.    Inadvertent Waiver.

An inadvertent disclosure may operate as a waiver of privilege in a federal proceeding unless (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder *promptly* took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)[6]. Fed. R. Evid. 502 (emphasis added). Whether the inadvertent

---

[6] Federal Rule of Civil Procedure 26(b)(5)(B) provides:

If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

Fed. R. Civ. P. 26(b)(5). "The receiving party may present to the court the questions whether the information is privileged or protected as trial-preparation material, and whether the privilege or protection has been waived." Committee Note to 2006

disclosure constitutes a waiver of privilege is analyzed using five factors:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in light of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to remedy the problem, and (5) whether justice is served by relieving the party of its error.

*Ewald*, 2014 WL 1309095, at *7; *Starway v. Indep. Sch. Dist. No. 625,* 187 F.R.D. 595,

597 (D. Minn. 1999) (ADM/AJB) (citing *Gray v. Bicknell,* 86 F.3d 1472, 1484 (8th Cir.

1996)) (adopting *Hydraflow, Inc. v. Enidine Inc.,* 145 F.R.D. 626, 637 (W.D.N.Y. 1993)).

Privilege may be waived when the party claiming privilege allows an opposing party to use

a privileged document without objection.   *Driscoll v. Standard Hardware, Inc.*, 785

N.W.2d 805, 818-19 (Minn. Ct. App. 2010).

## ARGUMENT

I.  **Plaintiff Should be Compelled to Produce Communications with Counsel through June 30, 2015, Because it Placed the Advice of Counsel in Issue and Such Advice is not Protected Merely Because it Touches Upon a Legal Opinion**.

Plaintiff has implicitly waived the attorney-client and work product privilege with

respect to its communications with its legal department through June 30, 2015, by putting

this advice at issue. On the one hand, Plaintiff has asserted that these communications are

protected by privilege. And yet, at the same time, Plaintiff placed this advice (proper

classification) at issue by affirmatively asserting, as the basis of its claims, that the

independent contractors were improperly classified on that very advice.   Therefore,

application of the privilege to these communications would deny Defendant of essential

---

Amendment to Federal Rule of Civil Procedure 26, Subdivision (b)(5).

information vital to its defense. *Medtronic*, 162 F.R.D. at 134–35. Moreover, the simple inclusion of attorneys on emails, or the discussion or interpretation of legal advice alone, does not extend the privilege beyond its legally recognized scope.

   a.   **Attorney-Client Privilege**.

   It is Plaintiff's burden to show that the attorney-client and/or work product privilege applies to the communications on the Amended Redaction Log. *Diversified*, 572 F.2d at 609.   This privilege, according to the Plaintiff, extends to all of the communication in question.   To the extent Plaintiff claims attorney-client privilege for communications where no attorney is identified as an author or recipient of the communication, these claims inherently fail.   *Kobluk*, 574 N.W.2d at 440.   These communications could not be "for the purpose of obtaining legal advice" absent an attorney being party to the communication. *Id*.   The mere forwarding of such communications, or interpretation or application of the same by others who are not attorneys, does not render it a privileged communication.

   With respect to the information redacted in Ms. Mathison's audit report, there are no documents evidencing Ms. Mathison ever communicated with legal prior to the date of the report.   Therefore, Plaintiff's assertion that the audit report contains legal advice is factually impossible.   Any "legal advice" Ms. Mathison received, was received second hand, and constitutes hearsay.   Since Plaintiff reproduced unredacted versions of certain documents on its initial Redaction Log, none of which are subject to the privileged claimed, Defendant suspects many other communications, including the audit report, are being invalidly withheld.

   Moreover,   even   if   someone   from   Plaintiff's   legal   department   is   on   a

communication, that does not automatically make it a privileged communication. *Leer*, 308 N.W.2d 305; *Kahl*, 277 N.W.2d 395.  If corporate counsel is acting as an ordinary businessman with respect to the communication, attorney-client privilege may not be properly claimed. *Mission*, 112 F.R.D. at 163.  Because Defendant does not have access to these communications, it is unclear what role corporate counsel played during the audit, specifically with respect to communications made during the first time period.

However, to the extent these communications are subject to the attorney-client privilege, the privilege has been waived by placing the advice of counsel in issue. *See Minnesota Wild*, 210 F.R.D. at 675.  Plaintiff is attempting to use claims of privilege as both a shield and a sword. *Id*.  Throughout this litigation, Plaintiff has based its claims upon its legal interpretation of the appropriate classification of Defendant's independent contractors.

As this privilege relates to the receipt and examination of the Minnesota Department of Revenue conclusion that Defendant's independent contractors were properly classified, it is uncertain whether those results are consistent (or inconsistent) with the legal conclusion reached by Plaintiff's legal department. These communications surrounding the Minnesota Department of Revenue audit are also at issue.

b. **Work Product Privilege**.

Plaintiff also has the burden of demonstrating that the work product doctrine applies. *Progressive*, 302 F.R.D. 497 at 501. Plaintiff has asserted work product privilege for many of the communications made during the second time period (May 16, 2015 – June 30, 2015) that concern the Minnesota Department of Revenue audit and that conclusion that the independent contractors were properly classified. Anticipation of litigation is essential to a finding of work product protection. *Hickman*, 329 U.S. at 511. All of these communications were made on or prior to June 30, 2015, the date Plaintiff was first notified

Defendant would be proceeding legally, and are not subject to the work product doctrine. When these communications were made, there was no likely chance of litigation, let alone the anticipation of litigation. *Mission*, 112 F.R.D. at 163.

To the extent the work product doctrine applies, Plaintiff has either waived work product protection for these communications by placing them in issue, or Defendant can demonstrate substantial need and undue hardship requiring their production. *Minnesota Wild*, 210 F.R.D. at 675. For the reasons outlined above, Plaintiff has placed the classification of Defendant's kiosk operators in issue.

Further, Defendant has clearly shown a substantial need for these communications and an undue hardship should they not be produced. Fed. R. Civ. P. 26(b)(3)(A). These communications as they are essential to proving its defenses to Plaintiff's claims; namely, that the independent contractors were properly classified and that the audit was unsubstantiated as it relates to the same. . Because Defendant's substantial need and undue hardship will outweigh any privilege, if indeed one exists, Defendant must have access to these communications.

## II. Ms. Roy's September 3, 2014, Email is Not Protected by the Attorney-Client or Work Product Privilege, or Alternatively, Such Privilege Has Been Waived.

Plaintiff asserts that it has not waived attorney-client privilege with respect to Ms.

Roy's September 3, 2014, email because it was inadvertently disclosed.  Since no attorney

is a party to the communication, and it merely relays Ms. Roy's independent understanding

[REDACTED]

[REDACTED]

[REDACTED] Even if the communication was

protected, Plaintiff had since waived any applicable privilege.

First, Ms. Roy's September 3, 2014 email does not contain any privileged or trial-

preparation material.  None of the parties to the communication are attorneys, rendering it

a factual impossibility for any party to render legal advice. *Kobluk*, 574 N.W.2d at 440.

[REDACTED]

[REDACTED]

[REDACTED] Therefore, the communication is not protected by the attorney-client

privilege because it was not made to an attorney for the purpose of securing legal advice.

*Id.*[7]

Second, the absence of an attorney on the email or the reference to any specific legal

advice also defeats any claim of attorney-client privilege. [REDACTED]

[REDACTED]

[REDACTED]

---

[7] The communication was made on September 3, 2014, well before Plaintiff was notified
that Defendant would be pursuing legal action.  *Mission*, 112 F.R.D. at 163.  Since Ms.
Roy is not an attorney, and the email was not prepared in anticipation of litigation, it is not
subject to work product protection. *Hickman*, 329 U.S. at 511.

Third, even if the document was protected by attorney-client privilege or the work product doctrine, Plaintiff has since waived any applicable protection.  Plaintiff failed to promptly demand the document's return when it learned on September 26, 2016, that the document had been produced and disclosed to Defendant.  Defendant first brought the disclosure of this document to Plaintiff's attention during the process of drafting a joint letter to Magistrate Judge Mayeron prior to a telephone conference scheduled on September 27, 2016.  Defendant sent a draft of this joint letter to Plaintiff on September 26, 2016, quoting and citing to Ms. Roy's email.  Plaintiff reviewed the draft and returned a redlined version of the document to Defendant, deleting the quote and citation.  The contents of this document were also discussed in a subsequent phone calls between counsel. When inadvertently disclosed documents are referred to several times without objection, the attorney-client privilege is waived. *Driscoll*, 785 N.W.2d 805 at 818-19 (holding the attorney-client privilege was waived when documents were referred to several times in depositions and motion papers without objection).

Thus, Plaintiff failed to take reasonable steps to prevent disclosure or *promptly* rectify the disclosure. Fed. R. Evid. 502(b).  Plaintiff was on notice that this document had

been produced and disclosed to Defendant for an entire month before claiming that the same was disclosed inadvertently.  Justice will not be served in relieving Plaintiff of this error, because as discussed above, the document is not protected by privilege in the first instance. *Ewald*, 2014 WL 1309095, at *7.  Plaintiff has waived any claim of privilege for the September 3, 2014 email.

## **CONCLUSION**

Based on the foregoing arguments and authorities, Defendant respectfully requests that this Court grant its motion to compel production, ordering Plaintiffs to produce the requested documents unredacted, immediately upon the filing of this Order, and grant Defendant its reasonable costs and attorneys' fees in bringing this motion.

MADIGAN, DAHL & HARLAN, P.A.

Date: November 14, 2016

By: */s/ Blair A. Harrington*
    Thomas P. Harlan (#210870)
    Jon R. Steckler (MN #322453)
    Blair A. Harrington (#0396504)
    Campbell Mithun Tower
    222 South Ninth Street, Suite 315 0
    Minneapolis, MN 55402
    Telephone: (612) 604-2000
    Facsimile: (612) 604-2599
    harlan@mdh-law.com
    steckler@mdh-law.com
    harrington@mdh-law.com

*Attorneys for Defendant Sushi Avenue, Incorporated*