## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Peerless Indemnity Insurance Company,

      Plaintiff,

vs.

Sushi Avenue, Inc.

      Defendant.

Civil No.: 15-04112 (ADM/LIB)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL AND MOTION TO REDESIGNATE**

## INTRODUCTION

Defendant Sushi Avenue's motion to compel exaggerates the real dispute between the parties, the role of counsel in said dispute, and the number of documents currently being challenged. This case involves the simple question of whether Defendant's sushi kiosk operators should be deemed "employees" for the purposes of premium calculation under Peerless's Policy of Insurance. Sushi Avenue expressly acknowledges that Peerless's auditor reached those conclusions *independently* from any attorney direction. (Def.'s Memorandum at pg. 4). The mere fact that Peerless employees occasionally sought legal advice from in-house counsel related to Peerless's contractual position along the way (as any client would seek such advice from its attorney) does not render these communications discoverable.

Defendant's lengthy narrative, though creative, appears to be generated for the purpose of confusing the issues. But regardless of intent, the narrative is not supported by the record—and most certainly is not supported by the documents it seeks through this

motion. Even the one document Defendant uses to create this narrative—an inadvertently produced e-mail that Defendant refuses to return notwithstanding the parties' agreed-upon claw-back provisions—does not carry the nefarious inferences Defendant asserts, and none of the documents Defendant now seeks will support its narrative either.

That stated, in response to this motion, Peerless shall produce unredacted versions of every disputed document for *in camera* review. Peerless is confident that the documents it has redacted (which actually only comprise twelve separate "strings" of documents, as further explained below) are privileged communications reflecting legal advice and opinions sought by Peerless employees (the "client") from its in-house counsel (the "attorney"). And as such, Defendant's motion should be denied.

## FACTUAL BACKGROUND

### I.      The Policy

Plaintiff and Defendant entered into a policy of worker's compensation insurance under policy number WC 8948248 (the "Policy"), which was in effect from March 19, 2013 through March 19, 2014 (the "first policy period"), and March 19, 2014 through February 15, 2015 (the "second policy period"). The Policy provides that Peerless will determine the final premium *after* the policy ends, retroactively, "'using the actual, not estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy,' and that if the final premium is more than the premium paid, [Defendant] must pay the balance." (*Complaint*, ¶ 23; *Berglund Decl.*, Ex. A). The Policy expressly states that the "final premium shall be based on payroll and other remuneration for the services of [Defendant's] employees" and

> all other persons engaged in work that *could* make [Peerless] liable under
> Part One (Workers Compensation Insurance) of this policy. If you do not
> have payroll records for these persons, the contract price for their services
> and material may be used as the premium basis.[1] *This paragraph . . . will
> not apply if you give us proof that the employers of these persons lawfully
> secured their own workers compensation obligations.*

(*Complaint*, ¶ 17; *Berglund Decl.*, Ex. A) (emphasis added).

Pursuant to the Policy terms—that is, after the first Policy had expired and the second Policy had issued—Peerless conducted its first audit in 2014. At that time, Peerless for the first time obtained a copy of the "Contract with Independent Contractor" (the "Contract") that Defendant enters into with each of its sushi kiosk operators. The Contract contained a number of provisions that, coupled with other evidence compiled during the course of the audit, led Peerless to conclude that the relationship between the kiosk operators and the Defendant were that of an employee and an employer.

Most notably, however, the Contract also stated

> Contractor [sushi kiosk operator] agrees to maintain, at Contractor's
> expense, worker's compensation insurance to fully protect both Contractor
> and Owner from any and all claims for injury or death arising from the
> performance of this contract.

---

[1] Though not relevant to the documents at issue in this motion, Defendant alleges in its memorandum that Dawn Mathison, Peerless's auditor, knew the 1099s were a mixture of labor and materials and failed to follow Plaintiff's internal procedures. (Def.'s Memorandum at pg. 5).    This is actually not correct: Ms. Mathison engaged in several communications with Defendant and its insurance agent regarding Defendant's payment of the sushi kiosk operators. Defendant sent an example of how its sushi kiosk operators were paid that showed that the sushi kiosk operators were invoiced for their materials and other administrative fees. (*Berglund Decl.*, Ex. B). Ms. Mathison noted that Defendant's example showed <u>labor only</u> as the materials were reflected by invoices and were not included in the 1099s. (*Id.*, Ex. C). Based upon the documentation provided, Peerless followed *state* guidelines (not internal, as Defendant suggests), and based premium on 90% of the total amount listed in each independent contractor's 1099. (*Harrington Aff.*, Ex. 8).  Peerless also notes that in any event these are "minimum" guidelines.

3

(*Berglund Decl.*, Ex. D).

Based upon the language in the Contract, Peerless asked its in-house counsel for legal advice regarding the Contract's language and Peerless's classification of its sushi kiosk operators. Peerless also asked Defendant for documentation verifying that Defendant's sushi kiosk operators obtained their own worker's compensation insurance as required by the Contract. Defendant failed to provide Peerless with any documents confirming its sushi kiosk operators obtained their own worker's compensation insurance. As such, under the terms of the Policy, Peerless included the sushi kiosk operators in the payroll because they were "engaged in work that *could* make [Peerless liable . . . ." (*Complaint*, ¶ 17; *Berglund Decl.*, Ex. A).

## II.    Peerless's Document Production

On April 22, 2016, Sushi Avenue served its First Set of Requests for Production of Documents. Sushi specifically requested "All documents relating to [Plaintiff's] assertion . . . that [Plaintiff] were (sic) required to include both Sushi Avenue's independent contractors and their employees in Sushi Avenue's worker's compensation rating calculation" and "All documents relating to [Plaintiff's] assertion . . . that Sushi Avenue is legally responsible for providing workers' compensation benefits to the employees of Sushi Avenue's independent contractors." (*Berglund Decl.*, Ex. E).  Subject to a number of objections, Peerless produced all non-privileged responsive documents, including but not limited to communication from Tim Zepnick to Sushi Avenue's agent, Melissa Marroquin, outlining the basis for Peerless's inclusion of the sushi kiosk operators and

4

their employees in Sushi Avenue's workers compensation rating calculation, including reference to a Minnesota statute, and communications from Peerless's auditor, Dawn Mathison, that include her independent research into the law of employee/independent contractor in various states operating Sushi Avenue kiosks. (*Id.*).

Peerless also produced a Redaction Log outlining the nature of the communications redacted on the basis of the attorney-client privilege and work-product doctrine. Despite being in possession of this log since June 7, 2016, Sushi Avenue did not send a letter until September 8, 2016, just days before depositions commenced, objecting to Peerless's redactions on the basis that these documents were prepared in the "ordinary course of business" and did not constitute attorney-client communications because an attorney was not the author of the document. (*Meet and Confer*, ¶ 1). Counsel for the parties have engaged in numerous written, telephonic and in-person communications in an attempt to resolve these issues without court intervention. And as a result of those communications, Peerless agreed to produce certain documents in unredacted form, but maintained its assertions of privilege with respect to others. (*Berglund Decl.*, ¶ 3).

After further document production (more fully explained below), Peerless produced an Amended Redaction Log to Defendant on October 18, 2016. (*Meet and Confer*, ¶ 5). While the parties were recently able to agree that communications on or after June 30, 2015 are privileged, the parties contest the remaining 122 privilege entries that were created before June 30, 2015.

### III.   Peerless's Inadvertent Disclosure

During depositions conducted on September 14 and 15, 2016, Peerless's counsel learned, for the first time, that additional written communications potentially responsive to Defendant's document requests were not provided to counsel.[2] (*Harrington Aff.*, ¶ 11). Peerless's counsel took immediate action to gather any additional responsive documents from its client to minimize the delay of the discovery schedule.

Between September 16 and October 5, 2016, Peerless's counsel received eight batches of documents, totaling 5,538 pages of documents. (*Berglund Decl.*, ¶ 4). These documents were subsequently reviewed by an attorney for privilege and produced in three installments: 4,936 pages were produced on September 23, 2016; 367 documents were produced on October 4, 2016; and 336 documents were produced on October 7, 2016. (*Harrington Aff.*, ¶¶ 12-13). During this time, Peerless conducted two depositions—one on September 21, 2016 and one on September 23, 2016—and was busy preparing to defend two depositions scheduled for September 28 and 29, 2016 (which were ultimately postponed) and two depositions scheduled for October 4 and 7, 2016 (which also were postponed). Peerless was also in the process of reviewing 7,958 pages of documents produced by Defendant on September 15, 2016, 572 pages of documents produced on September 19, 2016, and 5,981 pages of documents produced on September 22, 2016. (*Berglund Decl.*, ¶ 5).

---

[2] Peerless's counsel also discovered, upon receipt of documents produced in response to its subpoena *duces tecum* of Hornig Insurance Agency, that Defendant did not produce certain responsive communications between it and its insurance agent, Melissa Marroquin. Defendant has yet to produce its copy of these communications.

It is in this context that the Court should consider Defendant's "waiver" argument with respect to the inadvertently produced e-mail communication between Nicole Roy and Dawn Mathison. Though true Sushi's counsel provided a draft letter to Magistrate Judge Mayeron on September 26, 2016, the letter was intended to discuss an extension of discovery deadlines in advance of a teleconference scheduled for September 27, 2016; the teleconference was *not* intended to address privilege, and Peerless's counsel returned a draft that deleted those paragraphs—and with them all corresponding footnotes— addressing privilege issues. (*Berglund Decl.*, Ex. F).   One of the deleted footnotes apparently contained a quote from and citation to the inadvertently produced e-mail, but the footnote was deleted when Peerless's counsel deleted the paragraphs from the main body of the letter. (*Berglund Decl.*, Ex, G). Peerless's counsel does not recall discussing the e-mail in subsequent phone calls between counsel either, but concedes that the communication may have been addressed by Defendant's counsel in the broader context of settlement discussions, wherein Defendant's counsel provided a narrative similar to the one outlined in its memorandum.  (*Berglund Decl.*, ¶ 6). Those discussions commenced on October 6, 2016.  (*Id*. at ¶ 7). Peerless completed its production on October 7, 2016, and provided its Amended Redaction Log on October 18, 2016.  (*Id*. at ¶ 8).  Peerless requested that Defendant return the document on October 26, 2016, two days after Defendant quoted and cited to it on October 24, 2016. (*Meet and Confer*, ¶ 8).

## AGREEMENT TO *IN CAMERA* REVIEW

Peerless has enclosed twelve batches of unredacted documents for *in camera* review, which comprises the *entirety* of the disputed record.[3] These documents fall into three categories: (1) communications with in-house counsel requesting legal advice regarding the Minnesota Department of Revenue documents provided by Defendant's insurance agent, which included correspondence from Defendant's attorney; (2) communications with in-house counsel requesting legal advice regarding Defendant's contract with its sushi kiosk operators; and (3) communications with in-house counsel requesting legal advice regarding the premium dispute arising out of the 2014 audit.

## ARGUMENT

Notwithstanding Defendant's arguments to the contrary, a review of the documents at issue reveals that Peerless properly redacted communications protected by the attorney-client privilege, and properly identified the nature of the communications and the basis for the privilege in Peerless's redaction log. Fed. R. Civ. P. 26(b)(5); *see also Bartholomew v. Avalon Capital Group, Inc.*, 278 F.R.D. 441, 447 (D. Minn. 2011). Peerless should not be required to produce unredacted versions of these communications.

---

[3] Peerless has provided unredacted copies of each contested e-mail communication and identified those portions of the document that were redacted with a red box. The Court will note that these documents do not total 122 communications, however these 12 batches do reflect the entirety of the disputed record because (1) there are several redactions in a single document, and each redaction is separately explained in the redaction log, and (2) the production included numerous copies of the same communications. Peerless elected not to submit duplicate documents in the interest of judicial economy. However, it is willing to produce all duplicate copies of these documents should the Court prefer it.

380449

## I.     Legal Standard

Discovery, while broad, is not absolute. "Parties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1) (emphasis added). Indeed, the Rules allow parties to protect privileged information so long as a party "expressly make[s] the claim [and] describe[s] the nature of the documents, communications, or tangible things not produced or disclosed—and do[es] so in a manner that, without revealing information itself privileged or protected will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).[4]

## II.    The Redacted Attorney-Client Communications Are Privileged.

The communications at issue in this motion were created to obtain the advice of counsel, and therefore warrant protection from discovery.[5] "When a client acts on

---

[4] Peerless's Amended Redaction Log complies with Fed. R. Civ. P. 26(b)(5)(A). Peerless's Amended Redaction Log contains the following categories: Date, Bates No., From, To, CC(s), Doc Type, Subject Matter, and Privilege Claimed. This court has previously found that privilege logs that include these categories satisfy the requirements of Fed. R. Civ. P. 26(b)(5). *See Bartholomew v. Avalon Capital Group, Inc.*, 278 F.R.D. 441, 447 (D. Minn. 2011). In addition, Plaintiff logged separately each e-mail in an e-mail string to make it easier for Sushi Avenue to evaluate and challenge any claims of privilege over numerous e-mails in a string. *See Breathable Baby, LLC v. Crown Crafts, Inc.*, No. 12-cv-94 PJS/TNL, 2013 U.S. Dist. LEXIS 95508, at *25 (D. Minn. May 31, 2013) (ordering the defendant to provide an amended log that lists each privileged e-mail contained in the listed e-mail strings separately). Defendant does not appear to dispute the sufficiency of the redaction log, as it is not raised in its memorandum.

[5] The fact that Peerless was seeking legal advice distinguishes the instant case from the case upon which Defendant relies heavily in support of its motion, *Mission Nat. Ins. Co. v. Lilly,* 112 F.R.D. 160 (D. Minn. 1986). There, the attorneys were directing the loss investigation and not *acting in the capacity of an attorney*. *Id.* at 163. Here, Defendant

380449

privileged information from his attorney, the results are protected from discovery to the extent that they disclose privileged matter, directly or inferentially." *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 n. 6 (8th Cir. 1987).

In a diversity action, Minnesota state law governs questions of attorney-client privilege. *See* Fed. R. Evid. 501; *Bituminous Cas. Corp. v. Tonka Corp.*, 140 F.R.D. 381, 386 (D. Minn. 1992). Under Minnesota law, information is protected from disclosure under the attorney-client privilege if it is part of a confidential communication between the client and the client's attorney and it was made for the purpose of securing legal advice. *See Brown v. St. Paul City Rwy*, 62 N.W.2d 688, 700 (Minn. 1954).

The elements of the attorney-client privilege are: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance *permanently protected* (7) from disclosure by himself or the legal advisor, (8) except the privilege may be waived." *Kobluk v. University of Minn.*, 574 N.W.2d 436, 440 (Minn. 1998) (emphasis added). *See also* Minn. Stat. § 595.02, subd. 1 (b) (2013).

"Client communications intended to keep the attorney apprised of business matters may be privileged if they embody 'an implied request for legal advice based thereon.'" *Simon*, 816 F.2d at 404 (quoting *Jack Winter, Inc. v. Koratron Co.*, 54 F.R.D. 44, 46 (N.D. Cal. 1971)).

---

acknowledges that the audit was conducted without counsel's involvement. (Def.'s Memorandum at 4, n.2). Thus, *Mission* is inapposite.

Although Minnesota has not established a separate test for corporations, the attorney-client privilege is maintained in an employee's communication within a corporation in the Eighth Circuit if:

> (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1977) (en banc); *see also Leer v. Chicago Milwaukee, St. Paul & Pac. Ry. Co.*, 308 N.W.2d 305, 308-09 (Minn. 1981) (reviewing attorney-client privilege tests as applied to corporations but not adopting any test).

With respect to the first and third *Diversified* prongs, the disputed communications contain communications with in-house counsel or communications reflecting the legal advice and/or opinions received from in-house counsel regarding (1) the classification of Sushi Avenue's "independent contractors," (2) documentation received from Sushi Avenue regarding its dispute with the Minnesota Department of Revenue regarding the classification of its "independent contractors" (including a letter from Sushi Avenue's attorney), and (3) the language of Sushi Avenue's "Contract with Independent Contractors" and proposed compromise with Sushi Avenue in relation to the 2013-2014 audit. *See Diversified*, 572 F. 2d at 610 (quoting 8 Wigmore, Evidence § 2296 (McNaughton rev. 1961)) ("[A] matter committed to a professional legal adviser is *prima facie* so committed for the sake of the legal advice which may be more or less desirable

11

for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice."). As the Court will note during its *in camera* review, Peerless's in-house counsel included the following in each of his correspondences: "PRIVILEGED/CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION" indicating a commitment to ensuring the privileged nature of the communications.

With respect to the second *Diversified* prong, the following employees communicated with in-house counsel: Nicole Roy, Commercial Lines Underwriting Manager who was in charge of Sushi Avenue's account; Tim Zepnick, Vice President and Managing Director; Guy Decosterd, Zepnick's superior; and Curlette Alexander, Sr. Receivables Analyst who was in charge of collecting the premium. Each of these employees held positions of authority such that they did not require corporate superior approval to request legal advice.

Furthermore, with respect to the fourth *Diversified* prong, each of these communications related to the scope of the respective employee's corporate duties within the audit, underwriting/sales, or collections departments. For example, Nicole Roy, as manager of the Sushi Avenue account, sought legal advice regarding the classification of the "independent contractors" when it became apparent that the inclusion of the "independent contractors" would increase Sushi Avenue's premium.

Finally, with respect to the fifth *Diversified* prong, the in-house communications were not disseminated beyond the corporation. Defendant's argument seems to overlook this element of the analysis as Defendant repeatedly asserts that because an attorney is

12

not included on certain subsequent communications that the communication loses its privilege. But Defendant has produced no legal support for its argument that a corporate client cannot disseminate legal advice to others within the corporate structure that need to know of the attorney's advice.  Indeed, the communications were only shared among the employees requesting legal advice and those employees *directly involved in the audit* either from the collections, underwriting/sales, or audit departments. As such, the confidentiality of the legal advice was maintained and the attorney-client privilege applies to the enclosed communications.

### III.   The Work Product Doctrine Does Not Apply.

Defendant devotes a large portion of its brief addressing the work-product doctrine. (Def.'s Memorandum at pgs. 16-17; 23-24). As the Court will note, however, the amended redaction log's additional entries—even when addressing duplicate documents from the original redaction log—does not invoke the work-product doctrine. Peerless concedes that the work-product doctrine is not at issue with regard to the disputed communications, and to the extent any pre-June 2015 entries still contain assertions of such privilege from the original redaction log, they are in error.  That stated, any communication in which a work-product privilege was asserted *also* contains an assertion of attorney-client privilege. As such, the attorney-client privilege prevents disclosure *regardless* of the incorrect assertion of work product.

### IV.   Peerless's Advice of Counsel Is Not "At Issue."

Contrary to Defendant's assertion, Peerless has not put the content of its in-house counsel's advice directly at issue. Furthermore, Defendant's argument does not establish

13

that Peerless impliedly waived the privilege either. Rather, Defendant recycles its argument that the documents are not protected attorney-client communications.

Even though there is no settled rule finding implied waiver of attorney-client privilege, an implied waiver of the attorney-client privilege is commonly found when (1) assertion of the privilege is an affirmative act; (2) through the affirmative act, the asserting party has placed the protected information at issue by making it relevant; and (3) application of privilege would deny the opposing party access to information vital to its defense." *Medtronic v. Intermedics*, 162 F.R.D. 133, 134-35 (D. Minn. 1995). The Eighth Circuit examined the following two elements to determine if the attorney-client privilege was impliedly waived: implied intention and fairness and consistency. *Id*. at 135 (citing *Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201 (8th Cir. 1982), *cert. denied*, 459 U.S. 1017).

At-issue waiver is commonly found when "a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense." *Sedco*, 683 F.2d at 1206 (internal citations omitted). However, "merely denying a plaintiff's allegations does not place privileged information at issue." *Id*. Rather, a party places privileged information in issue by affirmatively asserting a claim or defense and *attempting to prove it by disclosing or describing privileged communications. See Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994).

14

Courts have narrowly construed the "at issue" waiver. *See e.g.*, *N. River Ins. Co. v. Phila. Reinsurance Corp.*, 797 F. Supp. 363, 370 (D.N.J. 1992); *Fox v. Cal. Sierra Fin. Serv.*, 120 F.R.D. 520 (N.D. Cal. 1988); *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 730 A.2d 51 (Conn. 1999). The court in *PETCO Animal Supplies Stores, Inc. v. Ins. Co. of N. Am.* recently found that a similarly situated party had not placed any information or advice contained in privileged documents at issue:

> Because of the important public policy considerations that necessitated the creation of the attorney-client privilege, the "at issue," or implied waiver, exception is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action. Such is the case when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship. In those instances the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because the issue cannot be determined without an examination of that advice. If the information is actually required for a truthful resolution of the issue on which the party has raised . . . the party must either waive the attorney-client privilege as to that information or it should be prevented from using the privileged information to establish the elements of this case.
>
> \*\*\*
>
> Merely because the communications are relevant does not place them at issue. *If admitting that one relied on legal advice in making a legal decision put the communication relating to the advice at issue, such advice would be at issue whenever the legal decision was litigated. If that were true, the at issue doctrine would severely erode the attorney-client privilege and undermine the public policy considerations upon which it is based.*

No. CIV. 10-682 SRN/JSM, 2011 U.S. Dist. LEXIS 70748, at * 64-68 (D. Minn. June 10, 2011) (quoting *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 730 A.2d 51, 52-56) (Conn. 1999)) (emphasis added).

380449

At no time has Peerless asserted that the basis of its claim is the advice of its in-house counsel. *See Complaint.* Again, this lawsuit involves the express language of the Policy and whether Defendant's kiosk operators should be deemed "employees" for the purposes of premium calculation. (*Id.*). Peerless will use non-privileged material to meet its burden, namely documents produced by Defendant and deposition testimony regarding Defendant's business operations and a legal analysis regarding the same.  As such, there has been no "at issue" waiver of the attorney-client privilege. *See PETCO*, No. CIV. 10-682 SRN/JSM, 2011 U.S. Dist. LEXIS 70748, at * 70 ("[W]here PETCO does not intend to rely on the advice and evaluations performed by [counsel] to establish the reasonableness of the settlement it reached with Medtronic, there can be no waiver.")).

Moreover, none of Defendant's affirmative defenses require the disclosure of these privileged communications.[6] *See Answer.* As argued above, Defendant's creative interpretation of one inadvertently disclosed e-mail does not provide sufficient evidence that the confidential communications between in-house counsel and Peerless are "at

---

[6] Defendant's affirmative defenses include: (1) failure to state a claim upon which relief can be granted; (2) inability to respond more fully to allegations contained in Complaint without Policy; (3) waiver, estoppel, unjust enrichment, assumption of the risk, and accord and satisfaction; (4) Plaintiff's conduct and actions contributed/caused damages; (5) Plaintiff disregarded its own Policy and internal audit procedures; and (6) refusal to recognize the audit of the Minnesota Department of Revenue constitutes a breach of the Policy by Plaintiff. In addition, Peerless has produced its Policy and the internal audit guidelines used by the auditor to conduct the audit as well as administrative rules and statutes from Minnesota, Illinois and New York that govern the classification of employees. In short, Defendant has more than enough information to prepare an adequate defense.

issue."[7] Furthermore, Defendant's argument ignores the fact that this case deals with a corporate client and a communication remains privileged if disseminated only among those who need to know of the contents of the attorney's communication. *Diversified*, 572 F.2d at 609.

In short, the dispute in this case centers on Defendant's failure to pay its worker's compensation policy premium. Regardless of the legal advice received regarding the classification of the sushi kiosk operators, Defendant failed to provide verification—as required under the Policy—that the sushi kiosk operators had obtained workers compensation insurance. (*Complaint*, ¶ 17). In addition, non-privileged discovery will show that Defendant exercised sufficient control under the applicable law to support a finding that the sushi kiosk operators were employees. Communications with in-house counsel are not needed to support Peerless's claims; therefore, Peerless did not impliedly waive the privilege.

---

[7] Furthermore, Defendant perplexingly contends that this e-mail "is not relaying a legal opinion or metal impression" (Def's Memorandum, pg. 26) in support of its argument that this e-mail puts Plaintiff's in-house legal advice "at issue." This, of course, is in direct contradiction to its assertion that Ms. Mathison relied on *her own* conclusions and research when finalizing the audit, "not the *conclusions reached by Plaintiff's legal department* as outlined by Ms. Roy." (*Id*. at pg. 7) (emphasis added). As the Court will see in its *in camera* review, Defendant's contrived and seemingly contradictory narrative from one relatively benign document is not supported by the documents Defendant seeks.

380449

**V.      Peerless's Inadvertently Disclosed Document Does Not Waive the Attorney-Client Privilege.**

Peerless's inadvertent disclosure did not waive the attorney-client privilege. To determine whether an inadvertent disclosure constitutes a waiver of privilege, the following five factors are analyzed:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in light of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to remedy the problem, and (5) whether justice is served by relieving the party of its error.

*Starway v. Indep. Sch. Dist. No. 625*, 187 F.R.D. 595, 597 (D. Minn.1999) (citing *Gray v. Bicknell*, 86 F.3d 1472, 1484 (8th Cir. 1996)) (adopting *Hydraflow, Inc. v. Enidine Inc.*, 145 F.R.D. 626, 637 (W.D.N.Y. 1993)).

In *Starway*, the court found that defendant's inadvertent disclosure did not constitute a waiver of the attorney-client privilege and ordered the plaintiff to return the document. *Id.* at 598. Applying the *Hydraflow* factors, the court found that the defendant took reasonable precautions to prevent inadvertent disclosure when the task of reviewing for privilege was "not casually placed in the hands of not-lawyer staff" even though "the erroneous disclosure is in itself evidence that greater care should have been taken in the document review." *Id.* at 597. Second, the court found that the inadvertent disclosure of a four-page memorandum in a production of 541 pages of documents is "not indicative of extreme lack of care" and the "number and extent of inadvertent disclosures was minimal." *Id.* The court further found that the defendant acted promptly to remedy the problem because the defendant asserted the privilege when the disclosure of the

document became known at a deposition about six weeks after production. *See id*. at 598. Finally, the court found that the interests of justice did not weigh in favor of disclosure because "[w]hile the document may be favorable to the plaintiff, the court [did] not find that the document contain[ed] evidence of fraud or crime and [found] no implicit support for the unexplained assertion that it may prove helpful in establishing that someone lied under oath." *Id*.

In the present case, Peerless took "reasonable precautions" to prevent the inadvertent disclosure in light of the extent of the document production. During this period of time, Peerless's counsel received 5,538 pages of documents from its client between September 16 and October 5, 2016. 4,936 pages of documents were produced on September 22, 2016 alone. Like the defendant in *Starway*, Peerless did not casually place the document review in the hands of a non-lawyer staff, but delegated the review of the all 5,538 pages of documents to an attorney. *See id*. at 597. In light of *Starway*, Peerless took "reasonable precautions" to prevent inadvertent disclosure.

Of the 4,936 pages produced on September 22, 2016, only *one* was inadvertently disclosed that contained confidential legal advice within the body of an e-mail thread. This does not indicate an "extreme lack of care or wholesome indifference to the task of sorting documents." Indeed, the *Starway* court found that *four* out of 541 pages was "minimal" when considering "[t]he number and extent of inadvertent disclosures . . . ." *Id*.

Contrary to Defendant's assertion, Peerless promptly notified Sushi Avenue of the inadvertent disclosure. Given Peerless's efforts to produce documents as quickly as

possible for Defendant's upcoming depositions, not to mention its own preparation for said depositions, it was not unreasonable for Peerless to take the time it did to recognize and claw-back its inadvertent production.

Defendant's reliance on *Driscoll v. Std. Hardware, Inc.*, 785 N.W.2d 805 (Minn. Ct. App. 2010)—where the parties used the document in motion practice and depositions before the respondent attempted to claim privilege *six months later*—is therefore misplaced. There, the court noted that the information contained in the document had become so well known to the parties that returning the document could not erase the imprint it had made. *Id.* at 818.

Unlike *Driscoll*, Peerless recognized and sought return of the document a little over one month after it had produced it, and within two days after receiving a letter in which the document was referenced in the body of the correspondence (as opposed to being buried in a deleted footnote). Moreover, the document had not been used by the parties in motion practice (with the exception of the current motion), nor has it been used in any depositions. The extent of the information contained within the document has been limited to counsel and not created a permanent "imprint" on the merits of the case. As such, Peerless's efforts to remedy the inadvertent disclosure were appropriate and prompt.

Finally, Defendant has asserted no compelling reason why it would be unjust to relieve Peerless of its error. Rather, Defendant merely recycles its argument that the document does not contain an attorney-client communication, which not only ignores the proper application of the attorney-client privilege to corporate clients, but also ignores the

380449

fifth *Hydraflow* factor. Besides, the document does little to assist Defendant in preparing its defense as Peerless has produced non-privileged documents related to the affirmative defenses contained in Defendant's Answer.[8]

Put simply, the attorney-client privilege exists to encourage a client to confide openly with an attorney and to enable an attorney to act more effectively on client's behalf, *Prior Lake Am. v. Mader*, 642 N.W.2d 729, 738-39 (Minn. 2002), and any waiver of this chips away at the important policy considerations behind this privilege. *See Kahl v. Minnesota Wood Specialty, Inc.*, 277 N.W.2d 395 (Minn. 1979) ("Unlike the exclusionary rules of evidence, . . . the rule suppressing disclosure of confidential communications from the client as well as advice from the attorney has for its purpose protecting a narrowly prescribed relationship, preservation of which by prohibiting such disclosure is regarded as of greater social importance than the benefits which would be gained by the state's exercise of its coercive or supervisory powers to compel the client and the attorney to make their private discussions public."). For these reasons, Peerless requests the Court to find that its inadvertent disclosure did not constitute a waiver of the attorney-client privilege.

---

[8] For example, Plaintiff has produced communication from non-attorney Tim Zepnick to Sushi Avenue's agent, Melissa Marroquin, outlining the basis for Plaintiff's inclusion of the independent contractors and their employee in Sushi Avenue's workers compensation rating calculation, including reference to a Minnesota statute, and communications from Plaintiff's auditor, Dawn Mathison, that include her independent research into the law of employee/independent contractor in various states operating Sushi Avenue kiosks.

380449

## CONCLUSION

In conclusion, the Court will find during its *in camera* review that the documents currently challenged by Defendant were not "ordinary" business records, but were instead efforts on the part of Peerless employees to seek legal advice from in-house attorneys. These communications, notwithstanding Defendant's protestations to the contrary, are not "at issue" in this case, nor did Peerless's inadvertent disclosure constitute a waiver. Accordingly, Defendant's motion should be denied, and a protective order preventing the disclosure of the disputed communications is warranted.

Dated: November 21, 2016

GROTEFELD HOFFMANN LLP

 _/s/Meghan M. Rodda_____
Daniel W. Berglund (MN  #0329010)
Meghan M. Rodda (MN # 0394984)
GROTEFELD, HOFFMANN, SCHLEITER,
GORDON, OCHOA & EVINGER, LLP.
150 South Fifth St. Suite 3650
Minneapolis, MN 55402
Telephone: (612) 564-4885
dberglund@ghlaw-llp.com
mrodda@ghlaw-llp.com

*Attorney for Plaintiff Peerless Indemnity*
*Insurance Company*

380449