UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Peerless Indemnity Insurance Company,          Court File No. 15-cv-4112 (ADM/LIB)

        Plaintiff,

    v.                                                        **ORDER**

Sushi Avenue, Inc.,

        Defendant.

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provisions of 28 U.S.C. § 636(b)(1)(A), upon Defendants' Motion to Compel, [Docket No. 33]. The Court held a Motions Hearing on November 28, 2016, and ordered the parties to engage in a further, in-person meet-and-confer on issues identified on the record by the Court. (Nov. 28, 2016, Motions Hearing, Digital Record, 1:48-50). The Court held the Motion in abeyance until the parties submitted a Joint Letter by email on December 9, 2016, and thereafter the Court took the Motion under advisement.

For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Compel, [Docket No. 33].

## I.    BACKGROUND AND STATEMENT OF ALLEGED FACTS

Peerless Indemnity Insurance Company ("Plaintiff") is an Illinois corporation that has its principal place of business in Boston, Massachusetts, and is licensed to sell insurance in Minnesota. (Compl., [Docket No. 1], 2).

Sushi Avenue, Inc., ("Defendant") is a Minnesota corporation with its principal place of business in Eagan, Minnesota. (Id. at 2; Answer, [Docket No. 9], 2). Defendant is in the business

of selling sushi and related products in kiosks located in supermarkets in Minnesota and other states. (Compl., [Docket No. 1], 2]; Answer, [Docket No. 9], 2). In doing so, Defendant generally enters into a contract, ("the Contract") with individuals who then operate the kiosks ("operators"). (Compl., [Docket No. 1], 2; Answer, [Docket No. 9], 2; Mem. in Supp., [Docket No. 34], 2-3). The Contract requires the operators to provide workers compensation insurance that is sufficient to protect both the operator and Defendant from potential claims. (Compl., [Docket No. 1], 3; Answer, [Docket No. 9], 2; Berglund Dec., Exh. D, [Docket No. 43-1], 17). Defendant claims that the operators are independent contractors, but that Defendant also has employees, such as the regional managers who work with the operators. (Mem. in Supp., [Docket No. 34], 2-3).

Plaintiff provided Defendant with workers compensation insurance for Defendant's employees for two policy periods:  March 19, 2013, through March 19, 2014, and March 19, 2014, through February 15, 2015. (Harrington Aff., [Docket No. 36], 1). For the first policy period, Plaintiff estimated that Defendant's premium would be $46,864; for the second policy period, the estimated premium was $39,630. (Id.). The policies provided that Plaintiff would determine the final premium after the end of each policy term, "using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy," and Defendant would then pay to Plaintiff any difference between the final premium and the estimated premium already paid to Plaintiff. (Berglund Dec., Exh. A, [Docket No. 43-1], 2).

On April 2, 2014, Plaintiff sent Dawn Mathison, a Senior Premium Auditor with Liberty Mutual Insurance, to conduct a physical audit of the first policy period. (Mem. in Supp., [Docket No. 34], 3). She reviewed actual payroll, form 1099s, and form 941s, as well as a copy of the

Contract. (Id. at 4). Based on her analysis, Mathison concluded the operators were not independent contractors but that Defendant and the operators had an employer/employee relationship. (Id.; Mem. in Opp., [Docket No. 42], 3).

On April 4, 2014, Mathison emailed Catie Sebolt, a Commercial Lines Underwriter at Liberty Mutual Insurance, a copy of the Contract; Mathison stated her belief that there was an employer/employee relationship between Defendant and the operators. (Mem. in Supp., [Docket No. 34], 4; Harrington Aff., Exh. 5, [Docket No. 36], 83). Four days later, Sebolt replied, stating: "I can see where there is concern for this account and would appreciate if you would hold off on processing the audit at this time. I believe we need to consult our legal department on some of the items in the contract you sent me a copy of." (Mem. in Supp., [Docket No. 34], 4; Harrington Aff., Exh. 5, [Docket No. 36], 83).

In May 2014, Nicole Roy, the Commercial Lines Underwriting Manager for Business Insurance at Liberty Mutual Insurance, informed Mathison that she had heard from the legal department and would contact Mathison about it. (Mem. in Supp., [Docket No. 34], 4; Harrington Aff., Exh. 6, [Docket No. 36], 84).

On August 4, 2014, Mathison informed her field audit manager, James Slaski, that she had finished the audit. (Mem. in Supp., [Docket No. 34], 5; Harrington Aff., Exh. 7, [Docket No. 36], 85). In the audit, Mathison identified the kiosk operators as employees, and adjusted the premium accordingly, resulting in a premium increase of $389,354. (Mem. in Supp., [Docket No. 34], 5; Harrington Aff., [Docket No. 36], 2).

On August 24, 2014, Roy emailed Mathison asking her to validate her figures. (Mem. in Supp., [Docket No. 34], 6; Harrington Aff., Exh. 9, [Docket No. 36], 90). When Mathison indicated that the figures were correct, Roy emailed Mathison again, stating that the operators

were "sole proprietors and not required to carry insurance coverage." (Mem. in Supp., [Docket No. 34], 6; Harrington Aff., Exh. 9, [Docket No. 36], 90-91). Subsequently, it appears that Mathison undertook independent legal research.

In a September 5, 2014, email to Defendant's insurance agent, Melissa Marroquin of Hornig Insurance Agency, Mathison stated: "I did a great deal of research today as to what is needed in NY, IL and MN to relieve Sushi Avenue of the Employee/Employer status for their Independent Contractors. I've attached supporting documents for each." (Mem. in Supp., [Docket No. 34], 6; Harrington Aff., Exh. 10, [Docket No. 36], 91-93). Mathison explained her research and her conclusions regarding the respective states' workers compensation laws. (Mem. in Supp., [Docket No. 34], 7; Harrington Aff., Exh. 10, [Docket No. 36], 91-93).

Plaintiff and Defendant could not resolve the additional audit premium for the first policy period, so Plaintiff cancelled the workers compensation coverage for the second policy period, effective March 18, 2015. (Mem. in Supp., [Docket No. 34], 7; Harrington Aff., [Docket No. 36], 2). The following month, Mathison began a cancellation audit for the second policy period. (Mem. in Supp., [Docket No. 34], 7). Using the figures obtained in the audit of the first policy period, Mathison prorated the cancellation audit and found an additional premium required for that period of $357,640. (Id.; Harrington Aff., [Docket No. 36], 2; Harrington Aff., Exh. 11, [Docket No. 36], 94).

On May 14, 2015, when Defendant had not paid either additional premium amount, Defendant's account was assigned to Curlette Alexander, a senior receivables analyst at Liberty Mutual Insurance. (Mem. in Supp., [Docket No. 34], 7; Harrington Aff., Exh. 12, [Docket No. 36], 95).

Defendant continued to dispute the classification of the operators as employees and on May 19, 2015, provided Plaintiff with documentation from an audit that the Minnesota Department of Revenue had conducted which concluded that the operators were properly classified as independent contractors. (Mem. in Supp., [Docket No. 34], 7-8; Harrington Aff., Exh. 13-14, [Docket No. 36], 96-121). The audit had reviewed the propriety of Defendant classifying the operators as independent contractors for tax purposes for tax years 2007 through 2009. (Harrington Aff., Exh. 14, [Docket No. 36], 98). The final letter from the Minnesota Department of Revenue stated:  "[W]e have determined that your Minnesota withholding tax was correctly reported." (Id. at 120).

Nonetheless, in an email on June 25, 2015, Timothy Zepnick, Plaintiff's regional Vice President, stated that Plaintiff's position had not changed and Plaintiff did not think the Minnesota Department of Revenue audit controlled the classification of the operators as employees or independent contractors for these purposes. (Mem. in Supp., [Docket No. 34], 8; Harrington Aff., Exh. 15, [Docket No. 36], 123-24).

On November 13, 2015, Plaintiff filed the present Complaint, claiming breach of contract based on Defendant's failure to pay the additional premiums for workers compensation insurance under the Policy. (Compl., [Docket No. 1], 4-5). Plaintiff seeks a declaratory judgment stating that the operators are Defendant's employees and should be included when calculating Defendant's premium. (Id. at 5-6). Plaintiff also seeks a judgment in the amount of the unpaid premiums, as well as appropriate costs and attorney's fees. (Id. at 6-7).

In its Answer, Defendant disputes Plaintiff's ability to independently determine whether the kiosk operators are employees or independent contractors without taking into account what Defendant terms a "legal determination or adjudication" regarding the operators' classification.

5

(Answer, [Docket No. 9], 3). Defendant alleges that the Minnesota Department of Revenue's conclusion that the operators were properly classified as independent contractors controls. (Id. at 1-2). Defendant also raised multiple affirmative defenses. (Id. at 5-6).

On April 22, 2016, Defendant served Plaintiff with its First Set of Interrogatories and Requests for Production. (Mem. in Supp., [Docket No. 34], 9; Harrington Aff., [Docket No. 36], 2; Mem. in Opp., [Docket No. 42], 4). Document Request No. 8 asked for: "All documents relating to [Plaintiff's] assertion . . . that [Plaintiff was] required to include both [Defendant's] independent contractors and their employees in [Defendant's] worker[]s compensation rating calculation." (Berglund Dec., Exh. E, [Docket No. 43-1], 24). Document Request No. 9 asked for: "All documents relating to [Plaintiff's] assertion . . . that [Defendant] is legally responsible for providing workers[] compensation benefits to the employees of [Defendant's] independent contractors." (Id.).

In response, Plaintiff provided 1,015 documents and a Redaction Log dated June 7, 2016, which identified 37 documents redacted due to attorney/client privilege and/or the work product doctrine. (Mem. in Supp., [Docket No. 34], 9; Harrington Aff., [Docket No. 36], 2, 6-11).

On September 8, 2016, Defendant informed Plaintiff that it believed the claims of attorney-client privilege or the work product doctrine regarding those documents referenced in the Redaction Log were improper because an attorney was not always identified as a creator or recipient of the communication. (Mem. in Supp., [Docket No. 34], 9).

The same day, Defendant received documents in response to Plaintiff's subpoena of non-party Hornig Insurance Agency (Defendant's insurance broker). (Id. at 10; Harrington Aff., [Docket No. 36], 2). Hornig's documents included emails from Nicole Roy which Plaintiff had not previously produced to Defendant. (Mem. in Supp., [Docket No. 34], 10).

Defendant requested production of unredacted versions of documents identified on the Redaction Log and the missing correspondence. (Id. at 9). Defendant asserts that Plaintiff refused, and instead offered to provide an Amended Redaction Log better articulating its assertions of privilege. (Id. at 9-10). Plaintiff contends that in response to the September 8, 2016, deficiency letter, Plaintiff did later produce certain requested documents in unredacted form, but it also maintained its assertion of privilege in regards to others. (Berglund Dec., [Docket No. 43], 1).

Through depositions it conducted on September 14 and 15, 2016, Defendant learned of yet more unproduced, written communications it believed were responsive to its document requests to Plaintiff. (Mem. in Supp., [Docket No. 34], 10; Harrington Aff., [Docket No. 36], 2). Plaintiff's counsel acknowledged its own lack of knowledge about certain communications disclosed during the depositions and agreed to investigate further. (Mem. in Supp., [Docket No. 34], 10; Harrington Aff., [Docket No. 36], 2-3; Mem. in Opp., [Docket No. 42], 6).

On September 16, 2016, Defendant sent Plaintiff another deficiency letter regarding discovery. (Mem. in Supp., [Docket No. 34], 10; Harrington Aff., [Docket No. 36], 3). In response, Plaintiff produced an additional 4,936 pages of documents. (Mem. in Supp., [Docket No. 34], 10; Harrington Aff., [Docket No. 36], 3; Mem. in Opp., [Docket No. 42], 6). Plaintiff stated that supplemental production would continue and that it intended to provide a corresponding Amended Redaction Log. (Mem. in Supp., [Docket No. 34], 10; Harrington Aff., [Docket No. 36, 3). Plaintiff produced 367 more documents on October 3, 2016, and 336 documents on October 7, 2016. (Mem. in Supp., [Docket No. 34], 10; Harrington Aff., [Docket No. 36], 3; Mem. in Opp., [Docket No. 42], 6).

As part of this supplemental production, Plaintiff inadvertently disclosed to Defendant a September 3, 2014, email between Roy and Mathison, which Plaintiff now claims is privileged. (Mem. in Opp., [Docket No. 42], 7). Plaintiff's other supplemental production was highly redacted, but included correspondence between Roy and Plaintiff's legal department and revealed its analysis of the Minnesota Department of Revenue audit. (Mem. in Supp., [Docket No. 34], 10-11). Supplemental production also included Mathison's file and her analysis and conclusions during her audit of Defendant. (Id. at 11).

Plaintiff produced an Amended Redaction Log on October 18, 2016. (Id.; Harrington Aff., Exh. 2, [Docket No. 36], 12-57; Mem. in Opp., [Docket No. 42], 5; Berglund Dec., [Docket No. 43], 2). The Amended Redaction Log identified 258 additional documents (for a total of 295) but did not further articulate or explain in any detail Plaintiff's claims of attorney-client privilege or the applicability of the work product doctrine with regards to each entry. (Mem. in Supp., [Docket No. 34], 11).

Defendant sent another deficiency letter on October 24, 2016, explaining what it saw as the continuing deficiencies in the Amended Redaction Log. (Id.). Defendant also demanded that Plaintiff produce "unredacted communications made through June 30, 2015." (Id.). Plaintiff refused. Plaintiff stated that the redacted portions of the communications and Mathison's audit report were properly withheld on the basis of attorney-client privilege. (Id.). Plaintiff also asserted that the attorney-client privilege protected Roy's September 3, 2014, email to Mathison, which Plaintiff had inadvertently produced and had requested be returned. (Id. at 11-12; Mem. in Opp., [Docket No. 42], 7). Defendant replied that the document was not privileged and, even if it was, the privilege had been waived. (Mem. in Supp., [Docket No. 34], 12).

On November 14, 2016, Defendant filed the present Motion to Compel, requesting production of certain documents Plaintiff claimed were privileged. (Motion, [Docket No. 33], 1, 12). Defendant sought production of unredacted versions of 123 documents identified on the Amended Redaction Log or, in the alternative, asked this Court to review the  documents in camera and determine whether they are actually protected by either the attorney-client privilege or the work product doctrine. (Mem. in Supp., [Docket No. 34], 13). In addition, Defendant asked the Court to determine that Roy's September 3, 2014, email to Mathison is not privileged or, if it is, that Plaintiff has waived that privilege. (Id.).

In response, Plaintiff claimed that there are not 122 documents in dispute; some of the entries on the Amended Redaction Log are duplicative in nature, and one document may include several redacted portions that correspond to multiple entries on the Amended Redaction Log. (Mem. in Opp., [Docket No. 42], 5, 8). Plaintiff generally argued that all of the requested communications are protected by the attorney-client privilege. (Id. at 2). Thus, Plaintiff asked the Court to deny Defendant's Motion to Compel. (Id.). In conjunction with its Memorandum in Opposition, Plaintiff submitted to this Court, unsolicited, what it asserted were unredacted versions of all of the disputed documents for this Court to review in camera. (Id. at 2, 8). Accompanying these documents is a "Disputed Communications Index" ("the Index") that Plaintiff prepared, which identifies, among other things, the redaction log entries that it represented refer to duplicate documents.

The Index breaks the disputed documents into 12 "batches," which Plaintiff asserted comprised the entirety of the disputed communications. (Id. at 8 & n.3). The majority of the batches consist of email conversations between various people. Each individual redacted portion from an email within the batch is labeled as a part of that batch. For example, Batch 3 consists of

five emails. Plaintiff has designated the body of the first email, which was redacted in the discovery produced to Defendant, as part 3-a; the majority of the body of the second email, which was similarly redacted, is designated as part 3-b, etc.

The Batches which are not in email format are Batch 1, which appears to be part of Mathison's audit, and Batches 11 and 12, which consist of documents that are identified on the Amended Redaction Log as "work cards."

On November 28, 2016, this Court held a Hearing on Defendant's Motion to Compel, at which the Court informed the parties of the need to clarify the documents and issues in dispute before the Court. (Nov. 28, 2016, Motions Hearing, Digital Record, 1:34-38).

Plaintiff informed the Court, on the record, that it no longer asserts that the attorney work-product doctrine renders any of the sought documents privileged. (Id. at 1:47-48). The parties also agreed, on the record, that the only documents in dispute are those communications dated June 29, 2015, or earlier. (Id. at 1:42-45). Noting that Defendant had not seen a copy of the Disputed Communications Index, which purported to identify which entries on the Amended Redaction Log were duplicates, as well as, which documents had already been produced in unredacted form, this Court directed the parties to engage in a further meet-and-confer in an effort to agree upon exactly which documents remain in dispute. (Id. at 1:35-39, 1:48-50). The parties were instructed to identify any entries on the Amended Redaction Log that were duplicative, and then through a Joint Letter to the Court (1) inform the Court whether it has all of the documents which are in dispute, (2) inform the Court whether there are any documents in its possession that do not require review, and (3) identify the documents the Court has that the parties wish it to review in camera. (Id. at 1:50-51, 2:06-08). The Court also directed the parties to provide any supplemental documents for the Court to review if necessary. (Id. at 1:50-51).

On December 12, 2016, the parties filed their Joint Letter, stating their agreement that the Disputed Communications Index fairly and accurately represents the communications that are currently in dispute. The parties did not identify any specific documents in the Court's possession as no longer being in dispute or duplicative, nor did they submit any supplemental documents or communications.

Upon receipt of the Joint Letter, the Court took the matter under advisement.

## II.    Standards of Review

Federal Rule of Civil Procedure 26(b)(1) states:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Courts generally have construed Rule 26(b)(1) broadly. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978); see also, Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992) (Rule 26 "is liberal in scope and interpretation, extending to those matters which are relevant"). Rule 26(b)(5) requires a party withholding information that is otherwise discoverable by claiming that the information is privileged to "expressly make the claim" and to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

This Court has jurisdiction over the case presently before it under 28 U.S.C. § 1332. Federal Rule of Evidence 501 states that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Plaintiff's claim in this case is

breach of contract; therefore, the controlling privilege law is state law. See, Morrill v. Becton, Dickinson & Co., No. 81-112C(C), 1981 WL 138040, *2 (D. E.D. Mo. Sept. 28, 1981); see also, Union Cty. Ia. v. Piper Jaffray & Co., Inc., 525 F.3d 643, 646 (8th Cir. 2008) ("Because this is a diversity case, the determination of whether attorney-client privilege is governed by state law.").

In Minnesota, "[t]he attorney-client privilege protects from disclosure 'communications that seek to elicit legal advice from an attorney acting in that capacity, that relate to that purpose, and that are made in confidence by the client . . . unless the privilege is waived.'" State v. Taylor, 869 N.W. 2d 1, 21 (Minn. 2015) (citation omitted); see also, Kobluk v. Univ. of Minn., 574 N.W.2d 436, 440 (Minn. 1998).

Although Minnesota has not explicitly articulated a test for attorney-client privilege in the corporate arena, it has in the past considered three tests, including a test adopted by the Eighth Circuit:

> [T]he attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his [or her] corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

Leer v. Chicago, M., St. P. & P. Ry. Co., 308 N.W. 2d 305, 308-08 (Minn. 1981) (quoting Diversified Indus. Inc. v. Meredith, 572 F. 2d 596, 609 (8th Cir. 1977) (en banc)).

The other two tests the Minnesota Supreme Court has considered for corporate attorney-client privilege are the "control group" test and the "subject matter" test. Id. at 308. Under the "control group" test, in which "privilege is determined by whether 'the employee [is] in a position to control or take substantial part in a decision about any action to be taken upon the

advice of the attorney[,] or that the employee [is] a member of a group having such authority.'"
Ewald v. Royal Norwegian Embassy, No. 11-cv-2116 (SRN/SER), 2014 WL 1309095, *10 (D. Minn. April 1, 2014) (quoting Leer, 308 N.W. 2d at 308). Under the "subject matter" test, the attorney-client privilege remains intact even if the communication is disseminated to a corporations employee if "the employee made the communication at the direction of his supervisor and where the subject matter upon which the lawyer's advice was sought by the corporation and dealt with in the communication was within the performance of the employee's duties." Leer, 308 N.W. at 308.

It is well-established that the party asserting the attorney-client privilege bears the burden of establishing it. United States v. Williams, 720 F.3d 674, 686 (8th Cir. 2013); Hollins v. Powell, 773 F.2d 191, 196 (8th Cir. 1985); U.S. Bank Nat'l Assoc. v. PHL Variable Ins. Co., No. 12-cv-877 (JRT/TNL), 2016 WL 1258466, *2 (D. Minn. March 30, 2016).

## III.   Defendants' Motion to Compel, [Docket No. 33]

### A.  Documents Not Properly Before the Court

As indicated in the parties' Joint Letter, Defendant asks this Court to order Plaintiff to disclose all of the documents identified in the Disputed Communications Index and submitted to this Court for in camera review. However, despite this Court's clear instruction at the Motions Hearing to the parties to ensure that only non-duplicative documents requiring the Court's consideration remain, it is necessary for the Court to first eliminate certain documents from the field of consideration.

### 1.  Documents Already Produced in Unredacted Form

The Court notes that the Disputed Communications Index indicates that certain documents before it have already been produced in unredacted form. For example, the Index

states that document Bates Numbered P-SA006362, which is identified on the Index as part 6-a, was "[p]roduced unredacted at P-SA002222." (See, Index, p.2). Two other entries on the Index are similarly designated as having been produced elsewhere in unredacted form:  part 6-b, and part 9-c. (See, Index, p. 2-3). The parties' Joint Letter indicates to this Court that both parties consider the Disputed Communications Index to be an accurate representation of the documents in question. Therefore, because Defendant already has these documents in unredacted form, the Court removes from in camera consideration the redacted information designated in the Disputed Communications Index as parts 6-a, 6-b, and 9-c.

### 2.   Duplicative Documents

Next, the Court also notes that, despite its instructions to the parties at the Motions Hearing, there are multiple instances in which the redacted information in one batch of documents is completely contained within another batch, in spite of the Court's explicit instruction to the parties to ensure that the documents submitted for in camera review were not duplicative. In those instances, the Court strikes the lesser Batch from in camera review and does not consider it since all necessary parts will be considered in the fullest Batch. Accordingly, the Court strikes from consideration:  (1) Batch 8 in its entirety, as the redacted information therein is fully contained within the redacted information in Batch 7; (2) Batch 11, as the redacted information therein is fully contained within the redacted information in Batch 9; and (3) Batch 12, as the redacted information therein is fully contained within the redacted information in Batches 5, 6, 7, 8, and 9.

### 3.   Documents Outside the Agreed-Upon Dates

As stated above, the parties discussed in detail on the record at the November 28, 2016, Motions Hearing, their understanding and agreement that Defendants were seeking unredacted

versions <u>only</u> of documents dated June 29, 2015, or earlier. Batch 10 consists of an email dated July 21, 2015. Therefore, it is not within the agreed upon field of review, and this Court strikes it from the documents submitted for in camera review.

### B.  Remaining Disputed Documents

The Court has conducted a thorough in camera review of the remaining documents. As explained above, for this Court to find the documents are protected by attorney-client privilege, Plaintiff must have met its burden to show that (1) the communication was to secure legal advice, (2) the employee made the communication at the direction of his or her corporate superior, (3) the superior's request was to seek legal advice for the corporation, (4) the subject matter of the communication is within the employee's corporate duties, and (5) the communication was not disseminated beyond people who need to know its contents because of the corporate structure.[1] <u>See</u>, <u>Leer</u>, 308 N.W.2d at 308-09.

Plaintiff argues that the remaining documents now before this Court satisfy the foregoing test. (Mem. in Opp., [Docket No. 42], 11-13). As to the first and third factors, Plaintiff contends that the communications are "with in-house counsel"[2] and/or reflect the legal advice or opinion of in-house counsel. (<u>Id.</u> at 11-12).

After review of the disputed documents, the Court agrees with this portion of Plaintiff's argument. The Eighth Circuit has instructed that "a matter committed to a professional legal adviser is prima facie so committed for the sake of the legal advice which may be more or less

---

[1] The additional tests which have been considered by Minnesota state courts require that the employee's position within the company allows him or her to take substantial part in a decision made upon the advice of the attorney and the subject matter is within the scope of the employee's duties. Because these requirements may be subsumed by the factor in the Eighth Circuit's test that requires that the subject matter be within the employee's corporate duties, the Court need not address them individually.

[2] Although Plaintiff did not ever specifically identify corporate counsel or otherwise clearly provide this Court with corporate counsel's name, the Court's own review of the record as a whole identifies Douglas Jenkins as Senior Corporate Counsel at Liberty Mutual Insurance.

desirable for some aspect of the matter, and is therefore, within the privilege unless it clearly appears to be lacking in aspects requiring legal advice." <u>Diversified Industries, Inc.</u>, 572 F.2d at 610. The communications submitted to the Court that remain under consideration are clearly either communications directly with corporate counsel or communications that convey corporate counsel's legal advice or opinions to others. As recognized by the fifth factor in the test for corporate attorney-client privilege, the latter type of communication is protected as long as it is not disseminated beyond people who need to know its contents because of the corporate structure.

Regarding the second factor, Plaintiff argues:

> [T]he following employees communicated with in-house counsel:  Nicole Roy, Commercial Lines Underwriting Manager who was in charge of [Defendant's] account; Tim Zepnick, Vice President and Managing Director; Guy Decosterd, Zepnick's superior; and Curlette Alexander, Sr. Receivables Analyst who was in charge of collecting the premium. Each of these employees held positions of authority such that they did not require corporate approval to request legal advice.

(Mem. in Opp., [Docket No. 42], 12). Without any evidence submitted to the contrary, the Court accepts Plaintiff's characterizations of these individuals' roles within the company and finds that the second and fourth requirements for corporate attorney-client privilege are met with respect to the communications between these individuals which are currently before this Court for in camera review.

The final factor states that attorney-client privilege only protects communications that are "not disseminated beyond those persons who, because of the corporate structure, need to know its contents." <u>See</u>, <u>Leer</u>, 308 N.W. 2d at 309. This factor parallels the well-established principle that "voluntary dissemination of a privileged document to . . . a third party waives the attorney-client privilege." <u>See</u>, <u>Ewald</u>, 2014 WL 1309095, at *7 ("Waivers of privilege occurs when the

communication is voluntarily disclosed to a third party."); <u>U.S. S.E.C. v. Welliver</u>, No. 11-cv-3076 (RHK/SER), 2012 WL 8015672, *4 (D. Minn. Oct. 26, 2012).

Plaintiff asserts generally that "the communications were only shared among the employees requesting legal advice and those employees *directly involved in the audit* either from the collections, underwriting/sales, or audit departments." (Mem. in Opp., [Docket No. 42], 13). Despite Plaintiff's lack of any specific argument for any of the Batches of documents remaining under review, this Court will address the remaining Batches individually.

### 1. Batch 1

Batch 1 consists of a single document. The Disputed Communications Index states that it is identified on the Amended Redaction Log as documents number 1, 4, 107, 194, and 231. First, the Court notes that those entries on the Amended Redaction log are not identical, which further muddies the waters.[3] The entries list different document dates, differing information in the "from" column of the Amended Redaction Log, different descriptions of the "document type," and different subject matter. For example, Document No. 1 is identified as an "Audit," dated August 7, 2014, from Dawn Mathison to "N/A," and the Amended Redaction Log identifies the subject matter as "Confidential communication with attorney reflecting legal thoughts, mental impressions, and legal opinion." However, the Amended Redaction Log lists the date for Document No. 4 as August 3, 2015. The Amended Redaction Log identifies Document No. 107 as an "Audit Recommendation," dated March 19, 2013, and describes the subject matter as

---

[3] The Amended Redaction Log is itself insufficient to satisfy the requirement of Federal Rule of Civil Procedure 26(b)(5)(ii) that the privilege log "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Plaintiff's Amended Redaction Log does not identify whether any of the individuals it names are attorneys or give any information about the individual's role within the corporation, nor does it provide more than a boilerplate description of why the privilege applies. <u>See</u>, <u>Luminara Worldwide, LLC v. Liown Electronics Co., Ltd.</u>, No. 14-cv-3103 (SRN/FLN), 2015 WL 9861106, at *4 (D. Minn. Oct. 5, 2015) (finding redaction log unsatisfactory when it failed to identify named individuals as attorneys and did not have an adequate description of the documents).

"Confidential communication reflecting HO legal advice and analysis of premium dispute within audit recommendation." The Amended Redaction Log contains no information about the author of Document No. 107 or its recipients.

The Court understands that the redacted information may be identical although the documents that contain it are not. Nevertheless, when the Court is left unable to identify a document because of inconsistencies and lack of specific information in a redaction log, the party responsible for the log may risk waiving the privilege. See, Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC, No. 09-cv-3037 (SRN/LIB), 2011 WL 13134540, *10 (D. Minn. March 3, 2011), aff'd by 2011 WL 1486033 (D. Minn. April 19, 2011).

Despite the confusion caused by the Amended Redaction Log, the redacted information within Batch 1 clearly conveys a legal opinion of the corporate legal department. According to the Amended Redaction Log, Mathison, whose role as the auditor of Defendant's account would create the need for her to know legal opinions regarding that account, created the document. There is no indication that it was disseminated outside those who needed to know its contents. Therefore, on its face, the Court finds that the information redacted from the document Plaintiff has designated as Batch 1 is protected by the attorney-client privilege.

Defendant argues, however, that Plaintiff has waived any privilege that attached by placing the legal advice of counsel "at issue by affirmatively asserting, as the basis of its claims, that the independent contractors were improperly classified on that very advice." (Mem. in Supp., [Docket No. 34], 20). Plaintiff denies that it has placed the legal communications or legal counsel's advice at issue . (Mem. in Opp., [Docket No. 42], 14-17).

The Court notes that despite the parties' recognition that state law governs privilege in diversity-jurisdiction cases such as this one, both parties cite only to federal law when arguing

this issue. Since Federal Rule of Evidence 501 and the Eighth Circuit's interpretation of that rule require the Court to apply Minnesota law to issues regarding privilege, the Court does so here.

The Minnesota Supreme Court has not yet recognized an at-issue waiver of the attorney-client privilege, although Minnesota Courts have recognized a similar waiver in relation to other privileges. See, In re Truscott, No. A15-1767, 2016 WL 2946218, *5 (Minn. Ct. App. May 23, 2016); see also, Younggren v. Younggren, 556 N.W.2d 228, 233 (Minn. Ct. App. 1996) (applying at-issue waiver to doctor-patient privilege). The Minnesota Court of Appeals recently addressed at-issue waivers in the context of the attorney-client privilege, and it noted that even when other jurisdictions have accepted this type of waiver, those jurisdictions have disagreed on the appropriate test. In re Truscott, 2016 WL 2946218, at *6.

The respondents in In re Truscott argued that the petitioner had placed her counsel's legal advice at issue by stating during a deposition that she had relied on counsel's advice. Id. at *8-11. The In re Truscott court noted that to find in that case the petitioner had impliedly waived the attorney-client privilege by placing counsel's advice at issue would allow parties to "create an at-issue waiver simply by asking [their opponents] in depositions if they relied on the advice of their counsel in taking an action." Id. at *9. "Such an implied waiver could chill parties from being candid with their counsel or even seeking legal advice." Id.

Instead, the In re Truscott court noted, three of the four tests used in jurisdictions that do accept an at-issue waiver of the attorney-client privilege, including the majority test, require an affirmative act by the waiving party. Id. at *9. The court found no such affirmative act had occurred, Id. at *8; thus, the In re Truscott court did not determine what, if any, test Minnesota courts should use because it found that the petitioner in In re Truscott had not as a threshold matter even placed at issue any information covered by the attorney-client privilege. Id. at *8-10.

In the present case, there is a similar lack of an affirmative threshold act by Plaintiff which could ultimately waive attorney-client privilege by putting the privileged information at issue. As Plaintiff contends, it has not asserted that legal advice from its counsel formed the basis of its claim or its decision to classify Defendant's kiosk operators as employees rather than as independent contractors. (Mem. in Opp., [Docket No. 42], 16). Nor has Defendant pointed to any specific instance in which Plaintiff has done so. In essence rather, Defendant asserts that because it appears as though Plaintiff's classification of the kiosk operators as employees was actually not supported by the conclusions of Plaintiff's legal department, the recommendations of Plaintiff's legal department are necessarily at issue. (Mem. in Supp., [Docket No. 34,], 22).

As in In re Truscott, accepting Defendant's initial formulation of an at-issue waiver would chill parties from seeking legal advice. Following Defendant's logic, any time an individual disagrees with legal advice and takes alternate action, that individual has waived attorney-client privilege in any lawsuit resulting from the alternate action. This Court finds that this is an overly broad application of an implied waiver of the attorney-client privilege.

Because Plaintiff has not asserted legal advice from counsel as any part of its ultimate decision making, premium claims, or bases for the present lawsuit, it has not placed that advice at-issue. Therefore, Plaintiff has not impliedly waived the attorney-client privilege. In addition, as explained above, this Court concludes, after in camera review of the Batch 1 document, that it is protected by the attorney-client privilege.

Accordingly, this Court **denies** Defendant's Motion to Compel the production of an unredacted version of the document in Batch 1.

### 2. Batch 2

Batch 2 consists of two emails between Zepnick, the Vice President and Managing Director, and Douglas Jenkins, Senior Corporate Counsel. Because Batch 2 includes communications made by a corporate officer in order to secure legal advice on a topic within the scope of his corporate duties, the communications in Batch 2 are protected by the attorney-client privilege. However, the header at the top of the page that begins the communications in Batch 2 indicates that the communications provided to the Court in Batch 2 ultimately came from an individual named Ann Fitzpatrick. Plaintiff has not identified Ann Fitzpatrick, nor has Plaintiff explained Fitzpatrick's role in the corporate structure or how that role would make it necessary for her to be privy to the information contained in these communications.

Another Federal District Court within this District was faced with a similar situation and provides guidance here. In <u>Ewald v. Royal Norwegian Embassy</u>, although the court had its doubts about whether certain redacted information sought by the plaintiff was privileged, the court noted that the defendant Embassy first had the burden to show privilege, which included showing that each recipient of the purported privileged information had a need to know that information. 2014 WL 1309095, at *9. In the Report and Recommendation, which the District Court adopted in its entirety, the Court noted that the Embassy had categorized the recipients into three "need to know" groups, but had not explained why the individuals or groups needed to know the information. <u>Id.</u> at *9-10. While the court could presume that certain individuals, such as an ambassador or the deputy chief of mission, would need to know about purported legal matters involving employees at the Embassy, the Embassy had failed to explain why other individuals, such as a person with the job title "archivist" or the person responsible for the Embassy's economic affairs, needed to know about the legal advice at issue. <u>Id.</u> at *10.

The <u>Ewald</u> court concluded:

> Without this information, this Court cannot determine whether these groups needed to know legal advice. Therefore, under the federal common law, the Embassy has failed to show that the attorney-client privilege attaches to communications between employees, and has failed to meet its burden to show that the privilege was not waived when [the communication] was distributed to third parties.

Id. at *10. Considering the two additional corporate attorney-client privilege tests used by the Minnesota Supreme Court, the Ewald court likewise found that the Embassy's failure to identify the roles and responsibilities of the individuals who received the purportedly privileged information necessarily translated into a failure to show that the privilege was not waived by that receipt. Id.

Similarly, in the instant case, Plaintiff has entirely failed to identify Ann Fitzpatrick. In their Memorandum in Opposition, Plaintiffs identified the following people and their roles in the corporation: Nicole Roy, the Commercial Lines Underwriting Manager in charge of Defendant's account; Tim Zepnick, Vice President and Managing Director; Guy Decosterd, Zepnick's superior; and Curlette Alexander, Sr. Receivables Analyst in charge of collecting the premium. (Mem. in Opp., [Docket No. 42], 12). While this Court might assume that these individuals needed to know about legal matters involving this audit (because Defendant has offered nothing to the contrary), Plaintiff provides no information regarding Fitzpatrick, and it appears from the documents provided for in-camera review that Fitzpatrick received the entire email string represented in Batch 2.

This Court does not know whether Fitzpatrick's role in the corporate structure made it necessary for her to know the information in these communications, as required under the Eighth Circuit's test for privilege. Nor can this Court determine whether Fitzpatrick is "in a position to control or take substantial part in a decision about any action to be taken upon the advice of the

attorney[,] or . . . [is] a member of a group having such authority,'" as required to satisfy the state "control group" test. See, Ewald, 2014 WL 1309095, at *10. Nor can this Court determine whether Fitzpatrick received the communications in Batch 2 at the direction of a supervisor and whether "the subject matter upon which the lawyer's advice was sought by the corporation and dealt with in the communication was within the performance of the employee's duties," as required to maintain the privilege under the state "subject matter" test. See, Leer, 308 N.W. at 308.

Therefore, Plaintiff has failed to meet its burden to show that these communications were not disseminated in a way that waives the corporate attorney-client privilege. This conclusion does not depend on whether the documents are considered under the Eighth Circuit's test or either of the other two privilege tests used by the Minnesota Supreme Court.

The Court **grants** Defendant's Motion to Compel, [Docket No. 17], to the extent that it requests production of unredacted versions of the communications contained in Batch 2.

### 3.  Batch 3

Similarly, Batch 3 contains the same header naming Ann Fitzpatrick. As with Batch 2, this leads the Court to believe that Fitzpatrick had access to all of the emails and information in Batch 3. For the reasons explained above (the Court does not know who Fitzpatrick is or the nature of her role, if any, in the corporate structure), Plaintiff has again failed to meet its burden to show that attorney-client privilege protects these communications and has not been waived. Even if the emails might have been privileged before they were disseminated to Ann Fitzpatrick, Plaintiff has not met its burden to show how the privilege survived the dissemination.

In addition, the redacted portions identified as parts 3-c and 3-d, occur in emails that were carbon-copied to an individual named Stacie Graham. Here again, Plaintiff has provided this

Court no information about the identity or corporate role of Graham. Therefore, even if, for the sake of argument, this Court had not already found that the dissemination to Fitzpatrick waived the attorney-client privilege as to all of the communications in Batch 3, it would still find that the dissemination to Graham, whose identity is also unknown to this Court, waived the attorney-client privilege as to the communications in parts 3-c and 3-d.

Accordingly, the Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the documents Plaintiff has included in Batch 3.

### 4.  Batch 4

Batch 4 also bears the Ann Fitzpatrick header, so the Court finds that for the reasons already explained above, Plaintiff has yet again not met its burden to prove that the privilege to the emails contained in the string that constitutes Batch 4 has not been waived. In addition, the first email in Batch 4 is an email from Decosterd to Anita Pierce and James Slaski, and states only "FYI," indicating that the subsequent attached emails in the Batch (which include the purportedly privileged communications currently redacted) were forwarded to Pierce and Slaski.

Plaintiff has once again provided no information regarding either Pierce and Slaski or their roles, if any, within the corporation. Plaintiff has therefore failed to meet its burden to show that attorney-client privilege protects the information at issue that was disseminated to Pierce and Slaski. Accordingly, this Court again finds that dissemination to Pierce and Slaski of the emails in Batch 4 that may have included privileged information waived that privilege. Additionally, parts 4-b, 4-f, and 4-g were carbon copied to Graham, about whom Plaintiff has also provided no information. Thus, even if, for the sake of argument, this Court had not already found that the dissemination to Fitzpatrick waived the attorney-client privilege as to all of the communications in Batch 4, it could also find that the dissemination of Batch 4 to Pierce and Slaski likewise did

so. And, at the very least, the dissemination of parts 4-b, 4-f, and 4-g to Graham waived the attorney-client privilege with respect to those portions.

Accordingly, the Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the documents Plaintiff has included in Batch 4.

### 5. Batch 5

The Court's examination of the emails in Batch 5 further reveals the same type of deficiency as discussed several times already. The redacted information which Plaintiff now asserts to be protected by attorney-client privilege is contained in two emails that were both carbon copied to Slaski, Collin Becker, and Laura Abraham, none of whom have been identified by the Plaintiff to the Court. Thus, the Court has no way of knowing whether dissemination to these individuals waived the corporate attorney-client privilege, and Plaintiff has once more failed to meet its burden to even show that the privilege applies.

Accordingly, the Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the documents Plaintiff has included in Batch 5.

### 6. Batch 6 (Part c Only)

As explained above, the Disputed Communications Index informs this Court that parts 6-a and 6-b have already been produced in unredacted form, leaving only part 6-c for this Court's review.

Part 6-c is contained within an email from Zepnick to Jenkins, but that email was also carbon copied to Becker, Abraham, Slaski, and Alexander. Yet again, without knowledge as to the corporate roles (if any) of Becker, Abraham, or Slaski, the Court finds that dissemination to these individuals likewise as discussed above waived the attorney-client privilege as to the information contained in the email.

Accordingly, the Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the document Plaintiff has designated as part 6-c.

### 7. Batch 7

Batch 7 begins with an email that does not contain any redacted information, so is not labeled as a subpart, which asks the recipients to review the redacted information in the email below. Those recipients are Becker and Abraham, about whom, as the Court has already observed, Plaintiff has provided no information. Similarly, the emails that follow, parts 7-a and 7-b, were also carbon copied to Becker, Abraham, and Slaski. Once again, Plaintiff has failed to meet its burden to sufficiently identify these individuals or their roles within the corporation in order to permit this Court to even consider whether disseminating the emails to these individuals might not have waived the attorney-client privilege. Part 7-c, the final part, is Westlaw research that was attached to the email represented in part 7-a. Because part 7-a was disseminated in a way that waived the attorney-client privilege, so was the attached information.

Accordingly, the Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the documents Plaintiff has included in Batch 7.

### 8. Batch 9 (Parts a, b, and d Only)

Once again, as explained above, the Disputed Communications Index informs this Court that part 9-c has been produced in unredacted form elsewhere; therefore, that information is no longer before this Court for review. This Court finds that the information in each of the three remaining subparts, as with the majority of the other previously addressed information submitted for the Court's review, has been disseminated to individuals unknown to this Court. All three remaining subparts were sent to Abraham and Slaski, and part 9-d was likewise sent to Becker as well. For the same reasons already explained repeatedly above, this Court concludes that the

Plaintiff has failed to meet its burden to show that the attorney-client privilege (even assuming for the sake of argument it attached) with regards to this information has not been waived.

Accordingly, the Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the documents Plaintiff has included in Batch 9.

In summary, prior to conducting its in camera review relative to Sections B.1-8, above, this Court removed from consideration the documents which have been produced unredacted elsewhere. This eliminated from review parts 6-a, 6-b, and 9-c. The Court next struck from consideration the batches that are wholly contained within other batches of documents submitted for in camera review: Batches 8, 11, and 12. Third, the Court removed from consideration Batch 10 because it was outside the dates of disputed documents agreed to by the parties on the record at the November 28, 2016, Motions Hearing.

With regard to the remaining documents properly submitted to this Court for in camera review, this Court finds that the information in Batch 1 is protected by the attorney-client privilege, so **denies** Defendant's Motion to Compel with respect to that document. The remaining documents, however, have been variously disseminated to several individuals about whom Plaintiff has failed to provide this Court any information that would allow this Court to determine whether that dissemination waived or did not waive the attorney-client privilege (even assuming it attached). It is Plaintiff's burden, as the party asserting the privilege, to establish that the privilege applies to protect the disputed communications. Plaintiff has failed to do so. Therefore, this Court **grants** Defendant's Motion to Compel to the extent that it requests production of unredacted versions of the documents identified as Batches 2, 3, 4, 5, and 7 in their entirety, and Batch 6 and Batch 9, subparts 6-c, 9-a, 9-b, and 9-d, respectively.

### C.  The September 3, 2014, Email

In addition to the documents identified in the Disputed Communications Index, Defendant asks this Court to determine whether a September 3, 2014, email from Nicole Roy to Dawn Mathison that was purportedly inadvertently produced by Plaintiff is protected by attorney-client privilege. (Mem. in Supp., [Docket No. 34], 13, 24-34). The parties argue about whether the fact that no attorney was involved in the communication means there was no attorney-client privilege to begin with, whether Plaintiff sufficiently attempted to retrieve the document after discovering the inadvertent production, and whether Plaintiff took reasonable steps to prevent the disclosure. (Id. at 24-27; Mem. in Opp., [Docket No. 42], 6-7). See, United States S.E.C. v. Welliver, No. 11-cv-3076 (RHK/SER), 2012 WL 8015672, *4 (D. Minn. Oct. 26, 2012) (identifying these as the relevant factors to consider under Fed. R. Civ. P. 502 when examining whether inadvertent disclosure waives the attorney-client privilege). These are valid concerns, but this Court decides this issue on a simpler point.

Upon reviewing an undredacted version of the email in question, which was submitted under seal to this Court, the Court notes that despite Plaintiff's description of the communication as an email "between Nicole Roy and Dawn Mathison," (Id. at 7), the email in question is actually from Roy to Mathison and James Slaski. Once again, as explained in the preceding section, Plaintiff has the burden to establish that attorney-client privilege applies to protect a communication from disclosure, and the dissemination of a privileged communication beyond those who need to know its contents because of their role and duties in the corporate structure waives any attorney-client privilege. Because Plaintiff has yet again not established that Slaski fits within these parameters, the inclusion of Slaski as a recipient of the communication in question waives any protection of the communication even assuming for the sake of argument that it might have come under the attorney-client privilege initially.

Accordingly, the Court finds that the September 3, 2014, email which Plaintiffs designate as inadvertently disclosed shall not be clawed back by Plaintiff.

**IV.      CONCLUSION**

For the foregoing reasons, and based on all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED:**

1. That Defendants' Motion to Compel, [Docket No. 33], is **GRANTED in part and DENIED in part, as set forth above.**

Dated: January 4, 2017                         s/Leo I. Brisbois
                                               Leo I. Brisbois
                                               U.S. MAGISTRATE JUDGE